FRANKLIN RESOURCES,
INC., Plaintiff,

v.

FRANKLIN CREDIT MANAGEMENT
CORPORATION, Franklin Credit Recovery Fund, L.P. I through XXIII, and
Thomas J. Axon, Defendants.

No. 95 Civ. 7686 (CSH).

United States District Court,
S.D. New York.

Dec. 16, 1997.

**324**

Weil, Gotshal & Manges, New York City (Robert G. Sugarman, Kerri A. Kazak, of counsel), for Plaintiff.

Doherty, Rumble & Butler, P.C., Denver, CO (Peter Lacus, of counsel), for Defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This is an action for trademark infringement brought pursuant to the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, to which plaintiff appends state and common law claims of dilution, infringement, and unfair competition. Following a bench trial, the Court enters the following Opinion which will constitute its findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

## FACTUAL BACKGROUND

### The Parties

Plaintiff Franklin Resources, Inc. ("Franklin Resources") is a Delaware corporation with its principal place of business in San Mateo, California.

Franklin Resources was founded in 1947 as a mutual fund company. It has grown substantially since then, and at present has approximately $215 billion under management. For the most part, Franklin Resources manages these funds through the vehicles of mutual funds known collectively as the Franklin Group of Funds. The Franklin Group rivals in size such other leading groups of mutual funds as Fidelity, Dreyfus and Vanguard. Franklin Funds run the gamut of investment possibilities: there are equity funds, bond funds, money market funds, gold funds, government securities funds, tax-exempt funds, and the like. The Franklin Funds attract many small investors because most of them require an initial investment of only $100. At present, about 5.27 million different shareholder accounts exist for the various Franklin Resources products. Franklin Resources itself is a publicly owned company traded on the New York Stock Exchange.

Franklin Resources presently has about 6,000 employees. Franklin employees act as investment advisors to the several Franklin Funds; work in a distribution company responsible for distributing the funds to the investing public through intermediaries; and work in a service company that attends to purchases and sales made in the funds and other administrative services.

In addition to the Franklin Funds, Franklin Resources offers other forms of financial services. Franklin Resources offers individual investors management of interests in real estate investment trusts such as the Franklin Real Estate Securities Trust.

Franklin Resources' wholly owned subsidiary, Franklin Properties, Inc. establishes real estate investment trusts and performs real estate management. Another wholly owned subsidiary, Property Resources, Inc., has organized and acted as general partner

to a number of real estate investment limited partnerships.

Franklin Resources is the holding company for Franklin Bank, an FDIC insured California state chartered banking corporation, engaged in administering of deposit accounts and consumer loan financing. Franklin Bank's consumer loan portfolio includes secured and unsecured direct closed end consumer loans, credit card loans, auto loans and home equity secured revolving lines of credit.

At present, Franklin Bank has over 115,000 active customers for the various financial services it offers. Franklin Bank services its VISA and MASTERCARD credit cards. Franklin Bank solicits credit card accounts from Franklin Fund shareholders, and also markets its credit cards on college campuses, through on-campus agents and an Internet website. Franklin Bank currently owns or manages over $79 million in credit card receivables and services the accounts of over 90,000 credit card holders resident in all 50 states. About 40.6% of these credit card holders are Franklin Fund shareholders; 35.5% are college students; and 23.8% are other members of the general public.

Franklin Resources' wholly owned subsidiary, Franklin Capital Corporation ("FCC"), is a consumer finance company chartered and headquartered in Utah. FCC is involved in the financing and servicing of auto loan receivables generated through auto dealerships. FCC currently owns or manages over $224 million in automobile purchase financing contracts.

Since 1990, the Franklin Bank and FCC have generated in excess of $672 million in consumer loan assets.

Turning to the defendants, Franklin Credit Management Corporation ("Franklin Credit") is a Delaware corporation, maintaining an office at 6 Harrison Street, New York, New York.

Defendants Franklin Credit Recovery Fund, L.P. I–XXIII, were limited partnerships organized under the law of Virginia, with a place of business at 6 Harrison Street, New York, New York.

Defendant Thomas Axon is a resident of Brooklyn, New York and the president of Franklin Credit.

Franklin Credit is a finance company that deals principally with troubled loans. Franklin Credit purchases at a discount and services near-performing, under-performing and non-performing loans, the vast majority of which are secured by the borrower's principal residence. Franklin Credit purchases most of these loans from the Federal Deposit Insurance Corporation ("FDIC"), the Resolution Trust Corporation ("RTC"), or privately-owned banks and finance companies.

In the past, Franklin Credit raised funds to pursue this business through the use of "Limited Partnerships" whose names included the words "Franklin Credit Recovery Fund." Franklin Credit created 23 such Limited Partnerships, each partnership being the owner of a loan portfolio serviced by Franklin Credit. Franklin Credit was the general partner in the Limited Partnerships. However, Franklin Credit has discontinued the use of Limited Partnerships as a vehicle for raising capital. Each of the limited partnerships was dissolved prior to December 31, 1995.

*The Parties' Trademarks*

Franklin Resources placed into evidence four federal trademark registrations which it owns. PX 130, 192, 200, 215. Reg. No. 1,607,629 registers the word "Franklin" for "investment management services, and mutual funds advisory, distribution, and administration services," first used in commerce in 1937. PX 192.

Reg. No. 1,648,317 registers the name "Franklin Group of Funds" for the same services, and was first used in commerce in June 1973. PX 200.

Reg. No. 1,545,628 registers the name "Franklin Partners Funds" for "mutual fund investment management services," with a first use in commerce on May 4, 1987. PX 130.

Reg. No. 1,752,851 registers the name "Franklin California 250 Growth Index," and refers to services and activities not pertinent to this case. PX 215.

Franklin Credit has not registered its trademark. The trademark appears on the stationery that Franklin Credit uses in conducting its business. At the time this action was filed, that stationery contained the word "Franklin" in large type, with the words "Credit Management Corporation" in smaller type below the word "Franklin." Subsequently Franklin Credit has changed the style of its stationery. The current stationery contains the words "Franklin Credit" in large type and the words "Management Corporation" in smaller type below.

## DISCUSSION

### I. The Lanham Act Claim

*The Validity of Franklin Resources' Marks*

■ Typically, a Lanham Act plaintiff must demonstrate "that it has a valid mark entitled to protection and that defendant's use of it is likely to cause confusion." *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993). In the case at bar, the registration of Franklin Resources' trademarks establishes their validity and protectability. Franklin Credit does not contend otherwise. Accordingly the analysis turns to the likelihood of confusion. *See The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996) ("TSA has valid registrations for all of its marks, so the issue for determination is whether TSA has demonstrated a likelihood of confusion, and we are guided in this inquiry by the *Polaroid* balancing test.)."

*Likelihood of Confusion*

As noted, for a time Franklin Credit raised funds by means of a number of limited partnerships whose names included the words "Franklin Credit Recovery Fund." However, with the dissolution of each limited partnership prior to December 31, 1995, Franklin Credit has not used since that time, and is not using now, any trademark including the word "Fund." In these circumstances, the inquiry into the likelihood of confusion turns solely upon the parties' use of the name "Franklin."

It is common ground that, with respect to the use of "Franklin" in a trademark, Franklin Resources is the senior user and Franklin Credit is the junior user. The decisive question is "whether the junior user's use of the name gives rise to the likelihood of confusion among consumers of the junior user's goods or services." *Hutchinson v. Essence Communications, Inc.*, 769 F.Supp. 541, 545 (S.D.N.Y.1991). A likelihood of confusion for Lanham Act purposes exists, the Second Circuit has said recently, when

> numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark. For a finding of infringement a probability of confusion, not a mere possibility, must be found to exist.

*Gruner + Jahr*, 991 F.2d at 1077 (citations omitted).

*See also C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 17 (2d Cir. 1985) (likelihood of confusion exists where "there is any likelihood that an appreciable number of reasonable consumers would be misled or simply confused as to the source of the goods in question.").

■ In evaluating the likelihood of confusion, courts in this circuit apply the balancing test articulated in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). That test requires consideration of eight non-exclusive factors in deciding whether a likelihood of confusion exists: (1) the strength of the plaintiff's mark, (2) the degree of similarity between the plaintiff's and the defendant's marks, (3) the proximity of the products, (4) the likelihood that the plaintiff will "bridge the gap" between the two products, (5) actual confusion between the two marks, (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's product(s), and (8) the sophistication of buyers or users of the plaintiff's and defendant's goods or services. *Polaroid*, 287 F.2d at 495; *see Sports Authority*, 89 F.3d at 960; *Gruner + Jahr*, 991 F.2d at 1077.

■ As Judge Friendly, the author of the *Polaroid* decision, noted, "[e]ven this extensive catalog does not exhaust the possibili-

ties—the Court may have to take still other variables into account." 287 F.2d at 495. "Other variables" identified in subsequent cases reflect the fact that the district court, in granting or withholding a preliminary or permanent injunction in trademark infringement cases, acts as a court of equity. Thus district courts engage in a more general balancing of "the conflict interests of the parties involved," *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1140 (2d Cir.1979), and such equitable factors as "the nature of the senior user's priority, the senior user's delay in asserting its claim, and the harm to the junior user as compared to the benefit of the senior user that would result from the requested injunction." *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 214 (2d Cir.1985). Thus it follows that "[n]o single *Polaroid* factor is preeminent, nor can the presence or absence of one without analysis of the others, determine the outcome of an infringement suit." *Thompson Medical Co., Inc.*, 753 F.2d at 214.

I will now consider each of the *Polaroid* factors in the light of the trial evidence.

### Strength of Franklin Resources' Mark

■ "The term 'strength' refers to a mark's tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir.1995) (citation and internal quotation marks omitted). The Second Circuit has "set forth four categories to gauge the extent to which a mark indicates a source of goods or services: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Sports Authority*, 89 F.3d at 961. These categories are enumerated in the increasing order of strength.

Plaintiff at bar contends that its use of the name "Franklin" is arbitrary. That characterization confers the highest degree of strength. "Fanciful or arbitrary marks are eligible for protection without proof of secondary meaning and with ease of establishing infringement." *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993) (citations and internal quotation marks omitted).

Defendant contends that plaintiff's use of the name "Franklin" is descriptive only, the weakest form of mark after generic marks (which cannot be registered at all). "A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established." *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572.

While pigeonholing in this field of law can never be precise, I think that plaintiff's use of "Franklin" is suggestive. "A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of goods." *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572 (citations and internal quotation marks omitted).

The evidence shows that Franklin Resources uses the name "Franklin" to evoke a memory and example of Benjamin Franklin, the founding father and tireless advocate of thrift and sound financial planning. Indeed, its print advertising, which Franklin Resources began during the 1980's and upon which it now spends about $20 million each year, invariably juxtaposes the name "Franklin" with Benjamin Franklin's image, closely resembling the image that appears on the $100 bill.

Franklin Resources has used the name since 1947. At present over 5 million investment accounts have been established in one or another of the Franklin funds.

■ Defendant argues that plaintiff has offered no evidence of secondary meaning; but if, as I conclude, plaintiff's use of the name Franklin is suggestive, secondary meaning is not necessary to make a mark protectable. "Suggestive, arbitrary or fanciful marks may be protected without a showing of secondary meaning." *Arrow Fastener Co.*, 59 F.3d at 391. Moreover, once a trademark that is only descriptive has become an incontestable registered trademark (as plaintiff's mark has done), the secondary meaning is established as a matter of law, at least in the context of protectability. *See Gruner + Jahr*, 991 F.2d at 1077 (noting approvingly that "the district court found that the mark

PARENTS was strong since it was an incontestable registered trademark, having necessarily acquired secondary meaning. Thus, [plaintiff's] descriptive registered trademark was correctly found to be strong for purposes of protectability."). Of course, one must draw a distinction between the protectability of a suggestive mark and the mark's strength in the related but discrete context of an action for infringement. "But a finding of suggestiveness does not guarantee a determination that the mark is a strong one. Although a suggestive mark is entitled to registration without evidence of secondary meaning, suggestiveness is not necessarily dispositive of the issue of the strength of the mark." *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572 (citation and internal quotation marks omitted). In that case, the district court found that plaintiff's "sportstick" for lip balm, while incontestable, was "only moderately strong, deserving of trademark protection, but not entitled to the fullest protection available under the law." *Id.* at 573. Factors militating against strength were modest sales during the pertinent years, indicating "a low national recognition of [plaintiff's] product," and "extensive third-party use of the words sport and stick," which "weighs against a finding that [plaintiff's] trade name is strong." *Id.*

In the case at bar, the duration and volume of the business that Franklin Resources has done under the name "Franklin" militate in favor of the strength of its mark.[1]

On the other hand, Franklin Credit has shown extensive use of the name "Franklin" by third parties engaged in one aspect or another of the financial service industry. Defendant produced a chart listing 65 such companies culled from the Yellow Pages of telephone directories. Plaintiff says that this list of names proves very little as to what these third parties do or with whom they do it, but the list of names is probative of seemingly widespread usage of the name "Franklin" in connection with such activities or services, prompted, one may reasonably infer, by an esteem third parties share with the plaintiff for Benjamin Franklin. It is well settled that third-party registration and use dilutes the strength of a trademark. *Hutchinson*, 769 F.Supp. At 548 (citing cases). That dissolution is significant in the case at bar.

I conclude, with respect to this *Polaroid* factor, that Franklin Resources' mark is moderately strong—no less than that, but no more.

### Similarity of the Mark

■ This factor "looks to whether the similarity of the marks is likely to provoke confusion among prospective purchasers. In making this determination, a court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember." *Lang v. Retirement Living Publishing Co., Inc.*, 949 F.2d 576, 581 (2d Cir.1991) (citation omitted).

■ In the case at bar, both parties used the name "Franklin" in their marks, and to that limited extent the marks are identical. But I use the phrase "limited extent" because there are significant differences in the overall impressions created by the parties' use of the "Franklin" name.

Franklin Credit simply uses the name on the letterhead of stationery with which it corresponds with non-performing borrowers whose mortgages Franklin Credit has purchased from the original lenders. Franklin Credit, so far as the trial record reveals, does not advertise its services to the general public in the media or otherwise.

Franklin Resources, on the other hand, advertises its investment management services and mutual funds extensively; and, almost invariably, those advertisements are accompanied by the image of Benjamin Franklin. Franklin Credit's stationery contains no such invocation of that Founding Father. Franklin Credit's stationery does contain graphical representations of pillars

---

1. Recently, Franklin Resources has begun to market its services under the name "Franklin–Templeton." That reflects the acquisition by Franklin Resources of another group of mutual funds. However, that acquisition is so recent and plaintiff's use of the name "Franklin" standing alone so protracted, that I do not think the new double name materially affects the analysis.

evocative of Roman or Greek architecture, a quite different form of imagery from that created by the likeness of Benjamin Franklin.

When viewing, as I must, the general and overall impressions created by the parties' trademarks, I conclude that they are more dissimilar than similar.

### Proximity of the Products and Sophistication of the Purchasers or Users

■ In keeping with recent Second Circuit authority, *see Cadbury Beverages v. Cott,* 73 F.3d 474, 480 (2d Cir.1996) ("The eighth *Polaroid* factor, 'sophistication of the buyers,' has been called 'analogous' to the proximity factor"), I will consider the third and eighth factors together. *See also Beneficial Corp. v. Beneficial Capital Corp.,* 529 F.Supp. 445, 449 (S.D.N.Y.) ("The question of the proximity of the products is considered in connection with the question of the sophistication of the buyers because the closeness of the two products is, at least in part, a function of the extent to which purchasers can and do examine and distinguish them.").

That is a particularly significant analysis in the case at bar. The "proximity-of-the-products" inquiry "concerns whether and to what extent the two products compete with each other," an inquiry which leads in turn to examination of "the nature of the products themselves and the structure of the relevant market." Considerations germane to the structure of the market include "the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." "Sophistication of the buyers" has been called "analogous" to the proximity factor, since the sophistication factor "recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Cadbury,* 73 F.3d at 480 (citations and internal quotation marks omitted).

In the case at bar, while there is a very limited overlap between the commercial activities of Franklin Resources and Franklin Credit, these two *Polaroid* factors, viewed separately and in combination with each other, militate strongly against a likelihood of consumer confusion between the trademarks.

As for the proximity of the parties' products, while to a limited extent Franklin Resources pursues other ventures, its primary business has been since its inception and remains today the marketing and administration of mutual funds. As for Franklin Credit, its business has been since its inception and remains today the purchasing at discount of non-performing loans from the original lenders (typically banks or the receivers of failed banks) and then pursuing the borrowers in efforts at collection. The proximity between these products, services, or activities (however one chooses to characterize them) is virtually nil.

On the question of proximity of products, *Beneficial Corp. v. Beneficial Capital Corp., supra,* a decision by Judge Lasker, applies *a fortiori.* Both parties were in the business of making commercial loans. In the course of concluding that "the possibility of the confusion against which the trademark laws protect must be characterized as remote," 529 F.Supp. at 450, Judge Lasker engaged in reasoning which it is useful to quote at some length, not only for its own guidance but also for his reliance upon a decision of Judge Weinfeld, equally applicable to the case at bar:

> First, plaintiff and defendant serve entirely different markets. Plaintiff's make only consumer loans; defendant's loans may be used for business purposes only, as provided by the SBIA. Plaintiffs' loans are made only to individuals; defendant has made only a few loans to individuals, and those were solely for the purpose of acquiring working capital. Moreover, the differences in average amounts loaned—plaintiffs' loans average $1,500, defendant's $54,000—is significant evidence of the difference in their respective markets. In addition, plaintiffs and defendant engage in entirely different marketing approaches. Plaintiffs advertise heavily in all of the major media. By contrast, defendant does no advertising or marketing of any kind, relying entirely on referrals. As Judge Weinfeld stated in a recent trademark case, the services offered by the parties

"appeal to different customers, are sold in entirely different markets, exist for distinct purposes, and thus, are in no sense proximate products." *Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147 (S.D.N.Y.1980).

Under the sophistication of buyers factor, the evidence shows that while Franklin Resources sells a limited number of mutual fund shares directly to investors, by far the major portion of its marketing effort focuses upon independent broker-dealers who in turn recommend Franklin Funds (as well as the products of other companies) to their clients, the individual investors, who become shareholders in the mutual funds. It is hard to imagine a more sophisticated, street-wise, savvy buyer (or, more precisely, conduit) of Franklin Resources' products and services than professional broker-dealers. It is not likely that a broker-dealer, who happens to learn that a company called Franklin Credit is engaged in the loan collection business, would confuse that company with Franklin Resources, linked to the broker-dealer as participants in the mutual funds business.[2]

If one focuses upon the individuals involved, the fund shareholders *vis-a-vis* Franklin Resources and defaulting mortgagors *vis-a-vis* Franklin Credit, plaintiff fares no better. There is no evidence that individuals who have fallen behind on their home mortgage payments are at the same time pursuing investment strategies in mutual funds, and the absence of such proof is not surprising.

Moreover, one may reasonably infer that those individuals who come in contact with either Franklin Resources or Franklin Credit have some degree of sophistication. Those who invest in mutual funds, even in relatively minor amounts and under the guidance of a broker-dealer, are individuals with discretionary income, prompted by concerns for their financial security, and determined to do something about it. Those who suddenly encounter Franklin Credit do so because

they own homes of sufficient value to stand as security for a mortgage loan, whose terms the individual borrowers presumably negotiated with the original lending bank. These circumstances bring the case at bar within Judge Lasker's analysis in *Beneficial Corp.,* 529 F.Supp. at 450, which considered possible confusion among borrowers from two lending companies, Beneficial Corp. and Beneficial Capital Corp.:

> Furthermore, defendant argues reasonably that we may infer at least a moderate amount of sophistication from the fact that its clients are in a position to borrow a minimum of $10,000. The fact that use of a particular service entails both substantial funds and a fairly detailed purchasing process is recognized as being a significant index of buyer sophistication (citations and internal quotation marks omitted).

As noted, entities related to Franklin Resources, the California banking corporation known as Franklin Bank, and the Utah corporation known as Franklin Capital Corporation, pursue forms of activity other than managing and marketing mutual funds: consumer loans and credit cards in the case of Franklin Bank, financing and servicing of auto loans in the case of Franklin Capital Corporation. But none of Franklin Credit's present activities gives rise to a significant risk of consumer confusion with respect to these non-core activities on the part of Franklin Resources.

### Bridging the Gap

■ Usually the term "bridging the gap" reflects the senior user's interest "in preserving avenues of expansion and entering into related fields." ·*C.L.A.S.S. Promotions,* 753 F.2d at 18. This factor looks to either the likelihood that the senior user will enter the junior user's business or the average customer's perception of the likelihood that the plaintiff would enter the defendant's market. *Sports Authority,* 89 F.3d at 963. But "bridging the gap" by the junior user should also be considered. "Inasmuch as a trade-

---

**2.** As noted *supra,* at one point Franklin Credit acquired Capital through the vehicle of limited partnerships which included the word "Fund" in their names. That practice led to one arguable example of confusion on the part of a broker-

dealer which I discuss *infra* under the caption "Actual Confusion." However, Franklin Credit no longer uses the word "Fund" in any of its trade names or marks.

mark owner is afforded greater protection against competing goods, a strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 354 (9th Cir.1979).

In the case at bar, there is no evidence that Franklin Resources intends to enter the business of purchasing non-performing loans at discount. As for Franklin Credit's intentions, Axon testified that on or about January 1, 1997, Franklin Credit established a subsidiary called Liberty Lending Corporation, which has obtained banking licenses "in various jurisdictions and will be originating mortgages to individuals." Tr. 351. That intended activity would appear to resemble the present activities of Franklin Bank, a Franklin Resources subsidiary; but I credit Axon's testimony that such activities will be conducted under the Liberty name, which negates any possibility of trademark confusion.

Accordingly, the "bridging the gap" factor militates against a finding of likelihood of confusion.

### Actual Confusion

Typically, an infringement plaintiff undertakes to prove actual confusion between its and the defendant's product or services in two ways: anecdotal evidence of particular incidents of confusion, and market research surveys. In the case at bar, Franklin Resources offers evidence in both categories.

#### (a) Anecdotal Evidence

Before considering the two incidents of actual confusion plaintiff contends the evidence reveals, it is useful to consider the particular sort of potential confusion that Franklin Resources says concerns it, and which prompted this action.

Counsel for Franklin Resources identified that concern in his opening statement. Focusing upon the conduct of defendant Franklin Credit, counsel said that having bought troubled loans, "Franklin Credit makes no bones about the fact that they aggressively seek to collect them," so that "[l]egal action is taken quickly against borrowers that re-

fuse to pay or consistently break promises to pay," with the objective "to obtain judgments against assets and/or garnishment of wages." Tr. 9–10. That aggressive image, resonating of Simon Legree rather than the wise, patriotic, and avuncular Benjamin Franklin, troubles plaintiff. Counsel continued:

> Your Honor, this kind of activity is 180 degrees from the image that Franklin Resources has set out to cultivate and has indeed cultivated over the 50 years of its existence, and it is for that reason principally that it is concerned and it is here today. Tr. 10.

Thus plaintiff's concern is not so much that defendant will try to palm off a similar product or service as plaintiff's, by means of a misleading trademark or trade packaging. Rather, Franklin Resources is concerned that its mutual fund shareholders or consumers of its other financial services will learn of Franklin Credit's aggressive, "hardball" tactics in collecting loans, and mistakenly believe that it is Franklin Resources behaving in that unsympathetic manner, to Franklin Resources' detriment.

The record contains no evidence of incidents of actual confusion of that particular sort. That is of some significance, since "[w]hile evidence of actual confusion is not necessary to the plaintiff's claim, its lack may be used against the plaintiff," *Cadbury Beverages,* 73 F.3d at 482 (citation and internal quotation marks omitted). In the case at bar, the absence of any evidence that anyone has ever held Franklin Credit's business methods against Franklin Resources supports the inferences that no confusion on that particular score exists, and that Franklin Resources' fears are more illusory than real. The two incidents of actual confusion that plaintiff contends the evidence establishes are quite different in nature. I discuss them in turn.

■■■ The first occasion occurred shortly before January 4, 1994. Counsel for Franklin Resources sent a letter bearing that date to Axon, as president of Franklin Credit, which reads in part:

> Recently, our client became aware that you and Vanguard Equities are offering a fi-

nancial product which allegedly "generates passive income at a guaranteed minimum rate of return." I enclose a copy of your solicitation which was brought to my client's attention by a confused customer. You call this limited partnership investment product FRANKLIN ASSET RECOVERY FUND, L.P.

PX 226.

The solicitation accompanying counsel's January 4, 1994 letter did indeed solicit the purchase of units in an entity called Franklin Asset Recovery Fund, L.P., which the brochure described as "a limited partnership established to profit from FDIC/RTC loan portfolios purchased at t discount." Across the face of the brochure forwarded to Axon appears this handwritten notation:

> When I received this it hit me as something good because "Franklin" is involved! Vanguard and Franklin—great combination, or is it?
>
> John [Last name illegible]

In counsel's January 4, 1994 letter to Axon, counsel stated that Franklin Resources "did not authorize this use of a confusing similar variation of its valuable Marks," and goes on to demand

> That you immediately cease all use of our client's valuable Marks on product and advertising and that you promise not to use colorable imitations of Franklin's Marks, including *any* use of the term FRANKLIN for investment services, in any other unauthorized way.

The type of "consumer" or "client" involved in this mailing is identified in the testimony of Harmon Burns, executive vice president of Franklin Resources, and Gregory Johnson, vice president of Franklin Resources. Burns said, of his company's concern with Franklin Credit's Mark, that "we first learned of this from a broker who thought we were involved." Tr. 61. Johnson testified at Tr. 152:

> The initial letter that we received had a note on it indicating that they were surprised to see Franklin and Vanguard in business together in this limited partnership. That's really what started us looking

into this whole matter. And any time we get a question from our most valued customer—and that's the broker dealer—we are going to take a hard look at the source of that.

In the light of this evidence, I find that the individual who called the matter to Franklin Resources' attention was a professional broker-dealer who had become familiar with Franklin Resources' financial products. It was that individual who made the handwritten notation upon the brochure for Franklin Asset Recover Fund, L.P., which counsel then passed on to Axon ■

### REDACTED BY COURT

This evidence leads to two conclusions. First, Franklin Credit's use of the name "Franklin Asset Recovery Fund, L.P." in a solicitation brochure created actual confusion in the relatively sophisticated mind of a broker-dealer, who thought that Franklin Resources might be involved in the product. Second, the particular risk of confusion demonstrated by to that incident, which occurred in 1994, no longer exists, because in 1995 Franklin Credit ceased using trade names which combine the words "Franklin" and "Fund." There is no evidence that Franklin Credit intends to resume such usage. Accordingly, this incident of past actual confusion is not probative with respect to the likelihood of present or future confusion.

■ Plaintiff's second perceived occurrence of actual confusion does not require extended discussion. Jennifer Bolt, called as a witness by plaintiff, testified that she is presently executive vice president and chief operating officer of Franklin Bank, president of Franklin Capital Corporation, and a vice president of Franklin Resources. She was asked on direct examination: "Ms. Bolt, have any instances come to your attention lately of actual confusion between Franklin Bank and Franklin Credit?" Tr. 219. Bolt responded that when the FDIC was about to conduct a routine examination of Franklin Bank, in aid of that examination the FDIC sent to Franklin Bank a set of forms saying "these are the

facts we are looking for, these are the materials we want you to put together." *Id.* The forms pertinent to the imminent examination of Franklin Bank, plaintiff's California banking subsidiary, constitutes PX 402 at trial. Item 10 on the "Examination Request List" called for the production of: "Most recent Franklin Credit Corp. buy rate structure sheet."

Having introduced PX 402 through the testimony of Bolt, counsel for plaintiff asked no further questions on direct examination, apparently content that this record demonstrated a probative incident "of actual confusion between Franklin Bank and Franklin Credit." But it does not, and for at least two reasons. First, the FDIC examiners who prepared and forwarded this form to Franklin Bank are not shown to be consumers of the services or products of either Franklin Resources or Franklin Credit. They are simply bank examiners. That is not to demean their important public service; but the Lanham Act is concerned with the likelihood of confusion as to source on the part of consumers of the parties' goods or services, and this exhibit does not speak to that issue.

Second, there is no basis in the record from which one can infer that the bank examiners who prepared this document had ever heard of the defendant, Franklin Credit, or mistakenly believed that Franklin Credit was related in any way to Franklin Bank or to plaintiff Franklin Resources. It is equally, if not more likely, that the reference in the FDIC form to "Franklin Credit Corp. buy rate structure" is a simple bureaucratic error. Bolt herself described how that error might have taken place. She testified: "I think that the FDIC intended to mean Franklin Capital Corporation, which is our finance company, which they do not regulate, and confused the name because the names are too closely related." Tr. 223. Bolt was not prepared to express the view that the FDIC suffered from any degree of confusion as between plaintiff and defendant. As she fairly stated, "I don't know what the FDIC thought at the time whether they were confused or not.... whether they were confused with [defendant] or another company, I can't speak to that, because as I stated I don't know who this person is. I am looking at the evidence the same as you did. That's all I received." Tr. 225.

In sum, this exhibit is not probative of actual confusion on the part of consumers as to the source of the plaintiff's and defendant's products or services.

*(b) Survey Evidence*

■ . Plaintiff offered a survey conducted by Philip Johnson, the president of Leo Shapiro & Associates, a company engaged in the preparation and taking of consumer surveys. Johnson testified at trial on behalf of plaintiff. The methodology and purported results of his survey were criticized by Dr. Claude Martin, Jr., a professor of retail marketing in the graduate school of business administration at the University of Michigan, a witness called by defendant. Over plaintiff's objection, I qualified Dr. Martin as an expert witness in the areas of market research and consumer surveys. Tr. 466–67.

The Johnson survey gave rise to pre-trial motion practice. Following discovery into proposed expert testimony, defendant moved *in limine* to exclude Johnson's survey and his testimony concerning it, on the grounds that the survey was fundamentally flawed and that Johnson had insufficient knowledge to lay a foundation for the admission of the survey results. I denied defendant's motion in a Memorandum Opinion and Order dated September 3, 1997 ("the September 3 Opinion").

I incorporate the September 3 Opinion by reference in this Opinion, so that its contents form part of the latter's findings of fact and conclusions of law.

While the September 3 Opinion denied defendant's motion to preclude the Johnson survey entirely, I did find "that the survey's universe was overbroad," slip op. at 12, which led to the question "whether this flaw is so severe that the survey must be excluded from evidence," *id.*, a question that I ultimately answered in the negative.

I think it is fair to say that plaintiff was not wholly persuaded by the Court's criticism of the Johnson survey's methodology. But plaintiff was sufficiently inspired (or pro-

voked) by the September 3 Opinion to ask Johnson to conduct a supplemental survey which Johnson managed to accomplish before the case was called for trial on September 8, 1997. At the trial, Johnson's original survey was received as PX 366, and the report of "Supplemental Interviews" as PX 404.

As noted in the September 3 Opinion at slip op. 4–5, the original survey was conducted in New York, Chicago, Atlanta and Los Angeles. A total of 400 interviews were conducted, evenly divided between males and females. In each city, half the respondents were intercepted at a shopping mall and the other half at a location which the interviewing company determined to be in the city's "financial district." Each respondent had to be over 21 years of age to qualify for the survey. Mall interviewees had to designate themselves as a head-of-household, and financial district employees had to be employed full-time. That was the extent of the screening.

Once a respondent qualified to participate, the interviewer showed him or her an exhibit booklet containing one advertisement from each of four financial services companies: Franklin Resources, The Equitable Companies, Inc., American General, and Fidelity Investments. After each respondent viewed the advertisements, the interviewer removed the booklet from sight and handed to the respondent, one at a time, letters from three companies: CGM Capital Development Fund, Fidelity Investments, and Franklin Credit. The interviewers rotated the order in which these letters were shown to respondents. After each letter was shown to the respondent, the interviewer asked the key question:

2a. Please take a look at this. Was there a product or service in the booklet I showed you that is from the same source or company as this?

( )NO ( )YES IF SPONTANEOUS: ( )DON'T KNOW

b. ASK OF ALL: What makes you say that? PROBE: What else?

(A space was provided to record the answers)

The question I have quoted is numbered "2." The questionnaire contains identical questions 3 and 4, in other words, one for each of the three letters which the interviewers showed, one by one and rotating the order, to the respondents.

The original survey's "Findings in Detail" appear at pp. 8–12 of PX 366. The first paragraph appearing under the subcaption "Response to Question 2, 3, or 4" reads as follows:

19. *When asked whether each of the three companies was in the booklet they had just reviewed,* 78% of the respondents correctly reported that there was a product or service from Fidelity Investments in the same booklet, and 83% correctly reported that there was not a product or service from CGM in the booklet. (emphasis added)

The succeeding paragraphs, summarizing other aspects of the responses to the survey, are all premised upon the question ¶ 19 says was put to the respondents, namely, "whether each of the three companies was in the booklet they had just reviewed." But that question was not actually put to the respondents. Rather, after showing a respondent one of the three letters, the interviewer asked: "Was there a product or service in the booklet I showed you that is from the same source or company as this?" That is a different question, and I think the difference is material.

After making certain adjustments I need not describe, the original survey concludes that the "likelihood of confusion rate" between Franklin Resources and Franklin Credit is 60%. ¶ 22. As noted, the interviewers were instructed to "probe" the reasons for a respondent's answer. Those reasons are summarized in ¶ 23 of the survey, under the subcaption "Basis for Franklin Response":

23. *When asked why they believe that there was a product or service in the booklet from the Franklin Credit Management Corporation,* most respondents (56%) make a specific spontaneous reference that they remember the name.

I interpret this to mean that most respondents, when confronted with the Franklin Credit letter, remembered having seen the

name "Franklin" on one of the documents in the booklet. That interpretation is reinforced by the survey's discussion of the "Error Rate Adjustment Computation" (p. 9), which focuses upon the percentage of respondents "who incorrectly name Fidelity Investments *as not being in the booklet,*" and the percentage of respondents "who incorrectly name CMG *as being in the booklet,*" resulting in a calculation of respondents "who incorrectly name Franklin Credit Management Corporation *as being in the booklet.*" (emphasis added).[3]

Such a survey proves something, but not very much. Principally, it proves that most of the respondents could read the name "Franklin" in the booklet, and remember it long enough to recognize the name when shown one of the three letters immediately thereafter. The question the survey used to introduce its detailed findings ("whether each of the three companies was in the booklet they had just reviewed"), while not the same question as that actually put to the respondents, nevertheless stands revealed by the respondents' reasons for their answers and the survey's internal structure as the more accurate indicator of what this survey shows.

That analysis applies with equal force to the supplementary survey, PX 404, which differs from the original survey only in respect of the screening of respondents. One hundred respondents were interviewed in Chicago and New York, and were subjected to additional screening questions, namely, whether they owned or might own shares in a mutual fund; whether they owned or might own a home or condominium; and whether they had taken out or might take out a home equity or personal loan. While these questions were intended to meet the Court's misgivings as to the survey universe, expressed in the September 3 Opinion, they have nothing to do with what the respondents' answers may reasonably be interpreted to disclose.

Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion. That proposition is illustrated by *American Greetings Corp. v.*

*Dan–Dee Imports, Inc.,* 619 F.Supp. 1204, 1216 (D.N.J.1985), *modified on other grounds,* 807 F.2d 1136 (3d Cir.1986). The case turned on the possibility of consumer confusion under market conditions with respect to the source of toys. The district court found no probative value in defendants' surveys, offered to show an absence of confusion:

> The results of these two surveys do not establish that there was no confusion between the Care Bears and New Goodtime Gang, either by the children or their mothers. Rather, in the court's view, this survey tested the participants' ability to read and little else. To put the products side by side and ask for a selection to be made by product name, when the product name appears on the package does not adequately test the existence of confusion.

Nor does the demonstrated ability of the present respondents, to read and remember the name "Franklin" as having been in both the booklet and on one of the letters, adequately test the existence of confusion as to source among consumers of mutual funds, financial services, or personal loans.

The other reasons for a "Franklin response" given in the original survey consist of a wide scattering of different reactions, some suggesting a confusion as to source, (*e.g.,* "Same company, two different products"), and others negating that confusion (*e.g.,* "It's a different company/this is a credit company, not investments."). That particular entry is followed by a footnote, the text of which reads: "Five of these respondents (1%) make a comment, when explaining their belief, that could be interpreted as an indication that these products may have come from two different companies."

No comparable analysis of the reasons for the responses given during the supplemental survey is possible, since the results of that survey, admitted as PX 404, do not give that information.

I think the surveys at bar are subject to the same sort of criticism Judge Lasker voiced in *Beneficial Corp.,* 529 F.Supp. at

---

**3.** While defendant's expert witness, Dr. Martin, criticizes this calculation, and much else about the Johnson survey, in the view I take of the case I need not consider that criticism.

450, where respondents were asked by telephone: "Do you think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?" While this produced a percentage of affirmative responses that would have been statistically significant in other circumstances, Judge Lasker discounted the result. He reasoned:

> The survey establishes no more than that the names are similar, a factor as to which there can be little genuine dispute in any event, and that portions of the general public will make the reasonable assumption that, in the absence of any other information, two companies with similar names are likely to have a business connection. However, this proposition provides no indication of public reaction under actual market conditions, and we conclude that there is no meaningful evidence of actual confusion.

In the case at bar, the surveys made some, if minimal, efforts to simulate "actual market conditions" by telling the respondents to take their time reading the booklet contents and the letters; and the survey did include the follow-up question asking, in respect of each of the three letters, whether "there [was] a product or service in the booklet I showed you that is from the same source or company as this?" Affirmative answers as to "Franklin" furnish some evidence of the likelihood of confusion among consumers in the marketplace. However, in the totality of the circumstances, and for the reasons stated, I think that evidence is of slight probative value.

### Defendant's Good Faith in Adopting its Mark

█ "This factor concerns whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Cadbury,* 73 F.3d at 482–83 (citation and internal quotation marks omitted).

Franklin Resources' principal activity has to do with the establishment, marketing and management of mutual investment funds, nationwide, an activity in which it has achieved a marked measure of success over a considerable number of years. It is therefore with an understandable sense of institutional pride that Franklin Resources proclaims its belief that Axon, in choosing the name "Franklin Credit" for his company, was aping the Franklin funds.

But Axon describes a quite different etymology for the trade name "Franklin Credit." He testified that since 1980, he has been engaged in the insurance and finance businesses, including "providing unsecured debt to high net worth individuals." Tr. 379–80. In 1988 and 1989, when the nation's savings and loan institutions were deeply troubled, Axon concluded that skills developed that particular activity could be applied "[t]o acquire notes from borrowers at a discount and try to rehabilitate and administer those notes to earn a margin."[4] Tr. 380. The company formed to start that business was defendant Franklin Credit Management Corporation. Axon testified that he named his new company after the street in the Tribeca area of New York where he owned (through a partnership) a building: the address was 185 Franklin Street. Tr. 380–81. Apparently a loyal denizen of Tribeca, Axon named a number of companies after streets in the area: "We used just about every street in Tribeca. Beach, Walker, Harrison, Franklin, Greenwich, Hudson. We used the word Tribeca also." Tr. 381. Axon testified that at the time he formed Franklin Credit, he had never heard of Franklin Resources or of Franklin mutual funds. *Id.*

That disclaimer is naturally wounding to plaintiff's *amour propre,* but I regard Axon as a credible witness and accept his testimony on the point. That testimony is rendered all the more plausible by the lack of resemblance between the business Franklin Credit was formed to conduct and the core business of Franklin Resources.

I find that in selecting the name "Franklin Credit," Axon did not act in bad faith *vis-a-vis* Franklin Resources.

---

4. As the trial evidence shows, Axon's company acquired the borrowers' non-performing notes *from the lenders,* to whom the borrowers had originally given them.

*The Quality of Defendant's
Product or Services*

■ "This factor generally considers whether the senior user's reputation could be tarnished by [the] inferior merchandise of the junior user." *Cadbury*, 73 F.3d at 483 (citation and internal quotation marks omitted).

Accepting that inferior services would also fit within this factor if the senior and junior users competed directly by offering the same services, in the case at bar they do not, to any material degree. Quite apart from that, Franklin Credit's services have not been shown to be "inferior" in any way that would trigger this *Polaroid* factor. Franklin Resources says that Franklin Credit's aggressive collection tactics may offend the sensibilities of Franklin Resources' customers; but I am not persuaded that Franklin Credit's methodology in enforcing loans, while undoubtedly different from the seasonal appeals of charitable organizations for voluntary contributions, is so extreme or unwholesome that it would work harm upon another company with the name "Franklin." As noted, there is no evidence of such harm.

*Conclusion on Lanham Act Claim*

■ Having considered the evidence on the light of the *Polaroid* factors, I conclude that plaintiff has not made out a Lanham Act claim against defendant.

Although plaintiff has proved that it has a distinctive name and that defendant's name is similar, the case for plaintiff fails primarily because of the very considerable gap between the financial services plaintiff offers to the public and the debt collection services that defendant inflicts (one cannot really say "offers") upon borrowers. Furthermore, the relative sophistication of the individuals involved militates against a finding that those

who deal with Franklin Resources and its products may mistakenly believe that the activities conducted by Franklin Credit are those of, or sponsored by, Franklin Resources. In addition, there is no evidence that Franklin Resources intends to bridge the gap by entering Franklin Credit's line of business, or that Franklin Credit contemplates a reverse bridging of the gap by conducting activities under that trade name which compare to the activities of the Franklin Resources or its affiliates. Nor is there any showing that defendants acted in bad faith, or that the quality or nature of Franklin Credit's services has tarnished Franklin Resources' reputation in the past, or is likely to do so in the future. Lastly, Franklin Resources has failed to prove actual confusion of a probative nature.

For these reasons, I find and conclude that plaintiff has failed to sustain its burden of proof that there is any likelihood that an appreciable number of reasonable consumers would be misled or simply confused as to the source of the services in question.[5]

Plaintiff's Lanham Act claim will be dismissed.

## II.

*The New York Statutory Claim*

■ Plaintiff also requests relief for trademark dilution under N.Y. General Business Law § 368–d. This section provides that:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

---

5. While application of the *Polaroid* factors furnishes sufficient grounds to dismiss plaintiff's Lanham Act claim, there is an additional ground for doing so, rooted in concepts of equity. Even after a plenary trial, where the question is plaintiff's entitlement *vel non* to a permanent, as opposed to a preliminary injunction, the court "may have to take other variables into account, including such equitable factors as the harm to the junior user as compared to the benefit to the senior user that would result from the requested

injunction." *Hutchinson v. Essence Communications, Inc.*, 769 F.Supp. at 568. In the case at bar, there is no evidence that Franklin Resources is being harmed by the collection policies pursued by Franklin Credit, and consequently no proof that an injunction would benefit Franklin Resources. In contrast, I accept Axon's testimony that requiring Franklin Credit to drop the name "Franklin" would be highly prejudicial in the context of administering many presently outstanding loans in that corporate name.

§ 368–d, commonly known as the anti-dilution statute, "applies to competitors as well as non-competitors, and explicitly does not require a plaintiff to demonstrate a likelihood of consumer confusion." *Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 42 (2d Cir.1994) (citations omitted). Accordingly, the failure of plaintiff at bar to prove a likelihood of consumer confusion does not preclude its claim under the anti-dilution statute.

"In order to establish a dilution claim, two elements must be shown: (1) ownership of a distinctive mark and (2) a likelihood of dilution." *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 506 (2d Cir. 1996). In the case at bar, plaintiff has shown that its "Franklin Mark" is sufficiently distinctive to satisfy the first prong of a dilution claim. But plaintiff fails to satisfy the second prong, which requires it to prove a likelihood of dilution.

A likelihood of dilution, within the meaning of this statute "can be established by a showing either of blurring or of tarnishment." *Hormel,* 73 F.3d at 506. "Dilution by blurring occurs when [c]ustomers or prospective customers . . . see the plaintiff's mark used on a plethora of different goods and services." *Hormel,* 73 F.3d at 506 (citation and internal quotation mark omitted). "Thus, dilution by 'blurring' may occur where the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's goods and services,* raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere,* 41 F.3d at 43 (footnote omitted).

Dilution may also occur by tarnishment. A trademark may be tarnished when it is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context," with the result that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Deere,* 41 F.3d at 43. The mark may also be tarnished if it loses its ability to serve as a "wholesome identifer" of plaintiff's product. *Id.* "Tarnishment can occur through a variety of uses," sometimes associated with sexual, obscene or illegal activity; "[h]owever tarnishment is not limited to seamy conduct." *Hormel,* 73 F.3d at 507.

In the case at bar, Franklin Resources argues that its trademark has been diluted by tarnishment, reciting in its proposed Conclusions of Law at ¶ 37: "Clearly the defendants' method of conducting business by aggressively pursuing debtor's to collect loans causes much ill will and tarnishes plaintiff's reputation."

I have to some extent discussed this professed concern of plaintiff's under Point I, dealing with the Lanham Act claim. Within the present context of the New York anti-dilution statute, I find and conclude that plaintiff has not proved the nature or extent of tarnishment necessary to satisfy the requirements of the act.

For the sake of completeness, I will add my conclusion that a similar failure exists with any effort on the plaintiff's part to demonstrate dilution of its trademark by blurring.

### III.

### *Common Law Trademark Infringement and Unfair Competition*

Plaintiff's final claim for relief is for common law trademark infringement and unfair competition.

■■■ Unlike an anti-dilution claim, a claim for common law trademark infringement requires the plaintiff to demonstrate consumer confusion. In that respect, the common law and the Lanham Act are the same. "To prevail on a statutory or common law claim of trademark infringement, a party must establish that the symbols for which it seeks trademark protection are valid, legally protectable marks and that another's subsequent use of a similar mark is likely to create confusion as to the origin of the product." *Tri–Star Pictures, Inc. v. Leisure Time Productions,* 17 F.3d 38, 43 (2d Cir.1994). In the case at bar, plaintiff's claim for common law trademark infringement fails for the same reasons that its Lanham Act claim failed.

■■■ As for plaintiff's unfair competition claim, "under New York law, the essence of unfair competition . . . is the bad faith misappropriation of the labors and expenditures of

another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Trustees of Columbia University v. Columbia/HCA Healthcare Corp.,* 964 F.Supp. 733, 750–51 (S.D.N.Y.1997) (citation and internal quotation marks omitted). Plaintiff at bar has failed to prove either defendant's bad faith or the likelihood of confusion. This claim fails as well.

### Conclusion

For the foregoing reasons, the Clerk of the Court is directed to dismiss the complaint with prejudice.

Defendant may recover its costs in an amount to be taxed by the Clerk.

It is SO ORDERED.