**LEXINGTON MANAGEMENT CORPORATION,**
Plaintiff,

v.

**LEXINGTON CAPITAL PARTNERS,** Lexington Capital Company and Lexington Capital Assets, Defendants.

No. 97 Civ. 9068(LAP).

United States District Court,
S.D. New York.

Feb. 27, 1998.

Stephen W. Feingold, Stephanie M. Foster, Whitman, Breed, Abbott & Morgan, L.L.P., New York, NY, for Lexington Management Corporation, plaintiff.

Kenneth R. Puhala, Layton Brooks & Hecht, New York, NY, for Lexington Capital Assets, Lexington Capital Partners, Lexington Capital Co.

**MEMORANDUM AND ORDER**

PRESKA, District Judge.

Plaintiff Lexington Management Corporation moves for a preliminary injunction, pursuant to Fed.R.Civ.P. 65, enjoining defendant Lexington Capital Partners & Co., Inc.[1] from using the trademark "Lexington" in connection with defendant' activities as a retail broker in the financial services industry. Plaintiff claims that defendant's use of the "Lexington" service mark "in the financial services industry as a retail broker" constitutes trademark infringement, trademark dilution and unfair competition under both federal and state law. In its complaint, plaintiff's federal claims are brought pursuant to Sections 32, 43(a) & (c) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) & (c)(1), and its state law claims are brought pursuant to New York's common law of unfair competition, as well as various provisions of New York's trademark infringement and dilution statutes. N.Y.Gen.Bus.L. §§ 349, 360–o, 360–l; N.Y. Arts & Cult. Aff.L. § 33.09. For the reasons set forth below, plaintiff's motion for a preliminary injunction on the basis of its Lanham Act claims is granted.

**I. THE PARTIES**

A. *Plaintiff*

1. *Plaintiff's Business*

According to the affidavit of its Managing Director, Lawrence Kantor, plaintiff Lexington Management Corporation, a Delaware corporation based in New Jersey, is a registered investment advisor and manages the "Lexington" family of eighteen mutual funds. (Verification of Lawrence Kantor, signed but not dated ("Kantor Ver.") ¶¶ 3, 7). These funds, which include such funds as the "Lexington Troika Dialog Russia Fund" (*id.* ¶ 9) and the "Lexington Strategic Investments (Gold) Fund" (Reply Verification of Lawrence Kantor, signed but not dated ("Kantor Reply Ver.") ¶ 12), represent over $2 billion

1. As the caption indicates, plaintiff's complaint named as defendants "Lexington Capital Partners," "Lexington Capital Company," and "Lexington Capital Assets." However, an entity named "Lexington Capital Partners & Co., Inc." has answered the complaint and is the real party-in-interest in this litigation. (*See* Declaration of Charles S. Stoffers in Opposition to Motion for Preliminary Injunction, Executed on January 30, 1998 ("Stoffers. Decl.") ¶ 2).

in assets. (Kantor Ver. ¶ 7). Plaintiff also manages over $1.7 billion of institutional investment assets. (*Id.*). Plaintiff manages and services its funds for the benefit of "over 150,000 financial intermediaries, institutional and individual investors." (*Id.*). According to Kantor's affidavit, "Lexington funds are designed to provide a variety of investment options for retail investors, financial planners, and intermediaries and for the defined benefit and contribution marketplace, including the 401(k) market." (*Id.*).

Plaintiff is the successor-in-interest to two sister companies which operated under the names "Lexington Capital Management, Inc." and "Lexington Capital Management Associates" since 1985 and 1987, respectively. (*Id.* ¶ 13). These companies "provided advice to institutional clients and individuals with high net worth regarding not only mutual funds, but a diverse range of investment opportunities including stocks, bonds, futures, limited partnerships and other forms of financial products." (*Id.*).

The sister companies merged with plaintiff in 1996, and "the financial services offered by both companies have since been assumed under the umbrella" of plaintiff. (*Id.* ¶ 14). Plaintiff contends that despite the merger, the "Lexington Capital Management" mark is still associated with $400 to $500 million in client assets. (*Id.*).

Plaintiff contends that, as part of a current trend in the financial services industry, "numerous prominent companies such as Morgan Stanley, Goldman Sachs, Fidelity Investments, and Schwab & Co. have expanded into a range of financial service markets combining broker-dealer, financial advise, [sic] mutual fund and other services." (*Id.* ¶ 18). Plaintiff's 1996 consolidation with its affiliates "reflects this trend and [plaintiff's] strategy of integrating the financial products and services offered to its clients." (*Id.*).

Plaintiff also has a wholly-owned subsidiary named "Lexington Funds Distributor, Inc." This entity is a broker/dealer that markets and distributes plaintiff's mutual funds. (*Id.* ¶ 16). Lexington Funds Distributor also is responsible for marketing plaintiff's funds and in 1997 managed an advertising budget of over $2 million. (*Id.* ¶ 21).

## 2. *Plaintiff's Marks*

Plaintiff owns two federally registered trademarks. Reg. No. 836,088 registers the word "LEXINGTON" for "financial advisory services and for services of or relating to mutual funds." This mark was registered on September 26, 1967 and was first used in commerce in 1967. (Kantor Ver. ¶ 4, Ex. 1). Reg. No. 1,654,499 registers a composite mark containing a "minuteman" logo and the word "LEXINGTON" for "financial advisory and mutual fund distribution services." This mark was first used in commerce in 1984 and was registered in 1991. (*Id.* ¶ 5, Ex. 2).

Plaintiff also claims common law rights in the "LEXINGTON" mark "arising out of its use of this mark in the financial industry since 1938." (*Id.* ¶ 6). According to plaintiff, this common-law-protected mark has been used not only in connection with mutual fund services, but also "in conjunction with investment advice and broker-dealer services since the mid-eighties." (*Id.*). These latter services were provided by the sister-companies, Lexington Capital Management, Inc. and Lexington Capital Management Associates, which merged into plaintiff in 1996. (*Id.* ¶ 14).

Plaintiff claims to have "aggressively guarded the exclusivity of its trademarks through the use of watch services and independent investigations." (Second Supplemental Verification of Lawrence Kantor in Further Support of Plaintiff's Motion for a Preliminary Injunction, sworn to on February 10, 1998 ("Kantor Second Supp. Ver.") ¶ 4; Kantor Ver. ¶ 22). To this end, plaintiff has sent cease and desist letters to unauthorized users of the "Lexington" mark for financial services and successfully halted all such uses. (Kantor Second Supp. Ver. ¶¶ 4–12, Exh. B–G). According to plaintiff, defendant here is the first entity to refuse to acknowledge and yield to plaintiff's rights in the "Lexington" mark in relation to services regulated by the NASD or SEC. (Kantor Ver. ¶ 22; Kantor Second Supp. Ver. ¶¶ 8, 13).

Since plaintiff first used the "Lexington" mark in commerce in 1967, plaintiff "and several of its affiliates have used this mark in

connection with financial advise [sic] and mutual fund services, and in keeping with the trends of the financial industry, have expanded their use of the mark in connection with a broad range of financial services." (Kantor Ver. ¶ 11).

Plaintiff alleges that defendant's use of the "Lexington" mark will "cause confusion and mistake in the minds of the purchasing public and falsely create the impression that the services of [defendant] are provided, sponsored or licensed by or affiliated with" plaintiff. (*Id.* ¶ 41).

### B. *Defendant*

According to the affidavit submitted by its President and Chief Compliance officer, Charles S. Stoffers, defendant "Lexington Capital Partners & Co., Inc." is a broker/dealer registered with the NASD, the SEC, and the regulatory bodies of 47 states and the District of Columbia. (Declaration of Charles S. Stoffers in Opposition to Motion for Preliminary Injunction, Executed on January 30, 1998 ("Stoffers Decl.") ¶ 2). Until mid–1997, defendant was known as "First Hanover Securities." It changed its name to "Lexington Capital Partners & Co., Inc." after four individuals from a firm called "LMJG Partners Inc.," bought a controlling share of First Hanover in April 1997. (*Id.* ¶ 14).

Unlike plaintiff, defendant is not a registered investment advisor. (*Id.* ¶ 26). Defendant "derives most of its revenue from commissions on stock transactions in which it acts as a retail broker, from underwriting activities and from its market-making activities." (*Id.* ¶ 25). Defendant provides its clients with the opportunity to invest in mutual funds, but states that this activity makes up only a "very insignificant" part of its business, with commissions from such sales comprising less than one percent of its revenues. (*Id.*). Defendant's clients "range from inexperienced, unsophisticated investors to experienced sophisticated investors." (*Id.* ¶ 46). Defendant does not advertise apart from maintaining a web site on the Internet and otherwise derives its business exclusively

from "existing clients, referrals and telemarketing." (*Id.* ¶ 32). Defendant's brokerage services are performed by a major clearing agent, C.I.B.C. Oppenheimer & Co., Inc., which clears all trades made on behalf of defendant's clients. (*Id.* ¶¶ 34, 35). Defendant has not registered its use of the "Lexington" mark. (*Id.* ¶ 39, Exh. P).[2]

## II. STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

■■■ A preliminary injunction generally may be granted when the moving party can establish both (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficient questions on the merits to "make them a fair ground for litigation and a balance of hardships tipping decidedly" in the movant's favor. *Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996). However, a higher standard applies where the requested injunction (1) will alter, rather than maintain the status quo, or (2) will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995). In such cases, the injunctive relief is deemed "mandatory" rather than "prohibitory", and should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from denial of preliminary relief." *Id.* at 34. The relief sought here is mandatory because it will alter the status quo by forcing defendant to stop using the word "Lexington" in its name. Further, if granted it will in many respects provide the same relief that would be awarded after trial. Accordingly plaintiff must meet the heightened "clear" standard.

■■■ In the trademark infringement context, a requisite showing of success on the merits generally establishes a risk of irreparable harm. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir.1988) ("[A] showing of a likelihood of confusion estab-

---

**2.** Plaintiff does not allege that defendant has infringed plaintiff's "Minuteman" logo. Hence

this dispute centers exclusively on defendant's use of the word "Lexington."

lishes both a likelihood of success on the merits and irreparable harm."); *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896, 904 (S.D.N.Y.1995). If, however, "the party seeking the injunction has delayed unduly, the delay may undercut the presumption of irreparable harm and serve as a basis for denying" the injunction. *Bear U.S.A.*, 909 F.Supp. at 903. Here there has been no undue delay.[3] Accordingly, my decision on the injunction turns on whether plaintiff can make a clear showing that it is entitled to relief on the merits.

## III. SECTION 32 AND SECTION 43(a) OF THE LANHAM ACT

On this motion for a preliminary injunction, plaintiff seeks relief for trademark infringement, false designation of origin, and trademark dilution under Section 32, Section 43(a), and Section 43(c) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and 1125(c). Section 32(1) protects against the application of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" to "labels, signs, prints, packages, wrappers, receptacles or advertisements" where "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Section 43(a) protects both registered and unregistered marks against the use of "any word, term, name, symbol, or device, or any combination thereof" which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A).

To succeed under its claims under Section 32 and section 43(a) of the Lanham Act, a plaintiff must demonstrate "(1) that it has a valid mark that is entitled to protection under the Act, and (2) that use of the defendant's mark infringes, or is likely to infringe, the mark of the plaintiff." *Estee Lauder,*

*Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir.1997); *Franklin Resources, Inc. v. Franklin Credit Management Corp.*, No. 95 Civ. 7686(CSH), 1997 WL 781621, at *3 (S.D.N.Y. Dec.16, 1997). These two requirements are discussed below.

### A. Is There a Valid Mark Entitled to Protection?

As noted above, a plaintiff under Sections 32 and/or 43(a) of the Lanham Act must demonstrate that the mark in question is valid and is entitled to protection. Under Section 7(b) of the Act, a certificate of registration of a trade or service mark issued by the United States Patent and Trademark Office is

> prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate.

15 U.S.C. § 1057(b). *See Les Ballets Trockadero de Monte Carlo, Inc. v. Trevino*, 945 F.Supp. 563, 569 (S.D.N.Y.1996). Registered trademarks, like those possessed by plaintiff here, "are presumed to be distinctive and should be afforded the utmost protection." *Lois Sportswear U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986); *Franklin Resources*, 988 F.Supp. at 327. Where, as here, a mark has been registered for more than five years, 15 U.S.C. § 1065 controls to render the mark "incontestable." Defendant does not dispute for the purposes of this motion that plaintiff's marks are valid and incontestable. (Def. Mem. at 5–6). This presumption extends, however, "only to the goods and services noted in [the] registration certificate." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir.1995). Hence, plaintiff has a presumption of an exclusive right to use the registered mark "Lexington", alone, for "financial advisory services and for services of or relating to

---

**3.** Despite defendant's protestations, plaintiff here has not delayed unduly. Defendant began using the mark in July 1997; plaintiff began attempts to settle the matter in September, 1997, filed suit in December, 1997, and brought this motion one week after settlement efforts broke down in January, 1998. As such, any delay was reasonable. *See Kraft General Foods v. Allied Old English*, 831 F.Supp. 123, 136 n. 12 (S.D.N.Y.1993); *Mastercard Int'l Inc. v. Sprint Communications Co.*, 30 U.S.P.Q.2d 1963, 1966–67 (S.D.N.Y. 1994).

mutual funds" and the mark "Lexington", accompanied by the minuteman logo, for "financial advisory and mutual fund distribution services."

Accordingly, the question of infringement turns on the second element necessary for a Lanham Act violation under Section 32 and Section 43(a)—whether there is a "likelihood of confusion" between the parties' goods or services. This question is analyzed below.

### B. Likelihood of Confusion: The *Polaroid* Test

■ Once a valid and protected mark is established, "[t]he test for infringement is whether the actor's use of a designation as a trademark ... creates a likelihood of confusion." *Estee Lauder,* 108 F.3d at 1508 (quoting Restatement (Third) of Unfair Competition § 21 comment a (1995)). A "likelihood of confusion" will be found on a showing that "numerous ordinar[il]y prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Id.* at 1510. "Likelihood" refers to a probability, not mere possibility. *Id.* (citing 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23:2, at 23–10 to –11 (1996)).

■ The Lanham Act protects against various types of confusion. Although it clearly protects against confusion that one party's products or services will be confused with those of its direct competitor, direct competition between the parties is not a prerequisite to a trademark infringement claim. Rather, trademark law protects just as much against situations where a defendant's acts are " 'likely to ... deceive as to the affiliation, connection, or association' of the defendant's goods or services with those of the plaintiff." *Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 962 (2d Cir. 1996) (citing 15 U.S.C. § 1125(a)(1)(A)); *see Les Ballets,* 945 F.Supp. at 569 (noting that trademark law protects against confusion as to "sponsorship or endorsement"); *American Stock Exch., Inc. v. American Express Co.,* 207 U.S.P.Q. 356, 364–65, 1980 WL 30139 (1980) (finding a likelihood of confusion because customers were apt to assume that the

junior user's services were "endorsed, approved, or in some other way associated with" those of the senior user).

In this circuit, inquiry into "likelihood of confusion" is guided by the well-known eight factor test set out by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). In evaluating likelihood of confusion under this balancing test, a court should examine: 1) the strength of plaintiff's mark; 2) the degree of similarity between the marks, 3) the proximity of the products or services, 4) the likelihood that the senior user will "bridge the gap" into the junior user's product or service line, 5) evidence of actual confusion between the marks, 6) whether the defendant adopted the mark in good faith, 7) the quality of defendant's products or services, and 8) the sophistication of the parties, customers.

When applying the *Polaroid* test, "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Lois Sportswear,* 799 F.2d at 872. "No single Polaroid factor is preeminent, nor can the presence or absence of one, without analysis of the others, determine the outcome of an infringement suit." *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 214 (2d Cir.1985); *Franklin Resources,* 988 F.Supp. at 327.

As seen below, after considering these factors I conclude that defendant's use of the "Lexington" mark in connection with the sale of securities and investment advisory services creates a likelihood of confusion between plaintiff's and defendant's services.

#### 1. Strength of the Mark

■ The "strength" of a mark refers to its "distinctiveness," or, more precisely, its "tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993) (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979)). As the Court of Appeals has noted, "the strength of the mark turns on its " ' "origin-indicating" quali-

ty, in the eyes of the purchasing public.'"" *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 581 (2d Cir.1991) (quoting *McGregor–Doniger,* 599 F.2d at 1131).

### a. Plaintiff's Mark is Arbitrary

■ The "inquiry regarding the strength of a mark often parallels the inquiry concerning the mark's validity, inasmuch as the 'strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded.'" *Arrow Fastener,* 59 F.3d at 391 (quoting *McGregor–Doniger,* 599 F.2d at 1131). When determining a mark's validity and entitlement to protection, courts in this circuit classify marks into one of four types. In ascending order of protectability and strength, the four types are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Estee Lauder,* 108 F.3d at 1508; *Lois Sportswear,* 799 F.2d at 871; *Franklin Resources,* 988 F.Supp. at 327. Plaintiff contends that its "Lexington" mark is "arbitrary" and thus possesses the highest degree of strength. (Pl.Mem. at 14).[4] Defendant differs, arguing that plaintiff's use of the word "Lexington" is at most "suggestive."

■ A suggestive mark is one that "employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use 'imagination, thought and perception to reach a conclusion as to the nature of the goods ...'" *W.W.W. Pharmaceutical,* 984 F.2d at 572 (quoting *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 213 (2d Cir.1985)). In contrast, an arbitrary mark "has an actual dictionary meaning, but that meaning does not describe the product." *Arrow Fastener,* 59 F.3d at 391.[5]

Presumably, as defendant notes, plaintiff's use of "Lexington" is an "undeniable reference" to the Battle of Lexington, a brief skirmish that occurred on April 19, 1775, which marked the first military clash of the American Revolution.[6] Indeed, plaintiff's intent to associate its business with the battle is confirmed by its use of the "minuteman" logo.

Defendant attempts to support its "suggestive" argument by reference to *Franklin Resources,* 988 F.Supp. at 327. There, plaintiff, a mutual fund company named Franklin Resources, claimed that its registered mark "Franklin" was infringed by the defendant, a loan collection business named Franklin Credit Management Corporation. In deciding after trial that Franklin Resources' mark was "suggestive," Judge Haight opined that the word "Franklin," often juxtaposed in plaintiff's advertising with a picture of Benjamin Franklin, was being used "to evoke a memory and example of Benjamin Franklin, the founding father and tireless advocate of thrift and sound financial planning." *Id.,* 988 F.Supp. at 327. As such, the name was "suggestive" because it called to mind qualities central to the successful conduct of a financial services concern like Franklin Resources. In this way, the mark "suggest[ed] the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of the goods." *W.W.W. Pharmaceutical,* 984 F.2d at 572.

■ Here, defendant argues that plaintiff's use of the word "Lexington" evokes the features and qualities of a financial services business. I cannot agree. The Battle of

---

4. Plaintiff suggests incorrectly that its mark must be deemed "strong" simply because it is registered. (Pl. Mem. at 14). While registration establishes protectability under the first element of the infringement test, "strength" for purposes of the confusion analysis is determined with reference to, but ultimately independently from, protectability. *Franklin Resources,* 988 F.Supp. at 328 ("Of course, one must draw a distinction between the protectability of a ... mark and the mark's strength in the related but discrete context of an action for infringement.").

5. A "fanciful" mark is a made-up term. *Arrow,* 59 F.3d at 391.

6. Historical consensus maintains that seventy colonial minutemen, under the command of Captain John Parker, squared off against some 700 British soldiers at Lexington when the former group refused the latter's orders to disperse. Shots were exchanged, and eight minutemen were killed. The Battle of Concord and "The Shot Heard Round the World" followed soon thereafter.

Lexington, as noted above, was one of the first military conflicts of the American Revolution. While "Lexington" might direct a potential customer's "imagination, thought, and perception" to a variety of images—perhaps revolutionary, military, patriotic, colonial, or independent—I have not been offered evidence indicating that "Lexington" suggests anything concerning the "qualities or features" of financial services or products in the manner that "Franklin" conjures thriftiness or sound financial planning.[7] Indeed, defendant itself explains that its founding partners chose "Lexington" to call to mind the "independence" they achieved by defecting from a rival firm before forming defendant's firm. (Stoffers Decl. ¶ 15; Def. Mem. at 22). I do not see how "independence" conjures up—even with use of imagination and resource—financial services. In short, as evidenced by defendant's own admissions, "Lexington" possesses "no independent relevance to the [service] at issue." *See Les Ballets Trockadero,* 945 F.Supp. at 569; *Clinique Laboratories, Inc. v. Dep Corp.,* 945 F.Supp. 547, 551 (S.D.N.Y.1996). Accordingly, I find that the mark is arbitrary, at least in the financial services context, and therefore is "among the strongest and most highly protected class of trademarks." *Les Ballets,* 945 F.Supp. at 570 (citation omitted).

### b. *Plaintiff's Mark has Secondary Meaning*

Although the holder of an arbitrary mark has no obligation to prove "secondary meaning," such evidence is nonetheless indicative of a mark's strength. *W.W.W. Pharmaceutical,* 984 F.2d at 573; *Clinique,* 945 F.Supp. at 551–52. "Secondary meaning" is described as "the extent to which the public has come to identify the mark with a particular product." *W.W.W. Pharmaceutical,* 984 F.2d at 573. Here, plaintiff has provided significant evidence that its "Lexington" mark has origin-indicating qualities. A number of plaintiff's mutual funds have received

favorable ratings from respectable analysts such as Morningstar. (Kantor Reply Ver. Exh. C). Plaintiff's funds are featured in the advertising of major mutual fund brokerage houses such as Fidelity and Schwab, as well as through full-service brokers such as Merrill Lynch, Smith Barney, Paine Webber, and Prudential. (*See* Kantor Reply Ver. ¶¶ 17–20, Exhs. F, G, H). Indeed, Fidelity advertisements tout the Lexington family of funds, referred to only as "Lexington," as among the "leading" funds sold by Fidelity. (*Id.* Exh. G). Similarly, a Schwab advertisement highlighted one of plaintiff's funds as one of the six top-rated international funds sold by Schwab. (*Id.* Exh. H). Other companies have similarly advertised plaintiff's funds. (*Id.*). As plaintiff has noted, these firms' "educated and selective decisions" to both carry and advertise plaintiff's funds speaks to the strength of plaintiff's "Lexington" mark.

Also, plaintiff's advertising efforts support a finding of strength. While advertising expenditures alone will not establish secondary meaning, *see McGregor–Doniger,* 599 F.2d at 1133, n. 4, plaintiff's widespread advertising efforts, on which it spent $2 million in 1997, nonetheless support a finding that it has a strong presence in the investment field. Plaintiff states that in 1997, it spent approximately $1.2 million on print ads in newspapers such as The Wall Street Journal and The New York Times, as well as in industry periodicals including Kiplingers, Barrons, Mutual Funds Magazine, Smart Money, Worth, and Consumer's Digest. (Kantor Reply Ver. ¶ 21). Plaintiff has spent over $200,000 of its advertising budget on radio advertisements and over $600,000 sponsoring high-visibility events such as investment industry conferences. (*Id.* ¶¶ 22, 24 & Exh. J). Further, plaintiff's portfolio managers often appear major television programs, including CNBC, CNN and Bloomberg. When they make these appearances, the managers are introduced in connection with the funds they manage, therefore exposing the viewing and

---

7. While I suppose the "revolutionary" tones associated with the Battle of Lexington might correspond to an aggressive or non-conventional fund, plaintiff manages a variety of funds, "each [with] a distinct investment objective." (Kantor Reply Ver. ¶ 11). Indeed, one of plaintiff's most

successful and often-discussed funds has held shares of virtually the same 30 companies since 1935 (*see id.,* Exh. C), a characteristic I deem more conservative than militant, radical, or independent.

listening audience to the "Lexington" mark. (*Id.* ¶ 16).

Unlike other cases where the strength of a mark was lacking due to "modest sales," and "low national recognition of [plaintiff's] product," *see W.W.W. Pharmaceutical*, 984 F.2d at 572, plaintiff here has presented ample evidence to demonstrate that it is a well-known, widely recognized, and financially strong company that is identified by its mark "Lexington."

### c. Evidence of Third-party Use of the "Lexington" Mark Does Not Render Plaintiff's Mark Weak

 Defendant contends that extensive third-party use of the mark "Lexington" renders plaintiff's mark weak. The law in this Circuit is clear that extensive third-party use can dilute the strength of a mark. *W.W.W. Pharmaceutical*, 984 F.2d at 573; *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581 (2d Cir.1991); *Trustees of Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733 (S.D.N.Y. 1997); *Elizabeth Taylor Cosmetics v. Annick Goutal*, 673 F.Supp. 1238, 1244 (S.D.N.Y. 1987). This is because "[t]hird-party uses of a mark on similar goods are relevant for the purposes of showing a 'crowded field' and that the mark is therefore weak." *Nikon, Inc. v. Ikon Corp.*, No. 89 Civ. 6044(KMW)(NG), 1992 WL 114509, at *2. But the existence of third-party use alone will not sap the strength of an otherwise robust mark. Rather, as the Court of Appeals has observed, "[t]he significance of third-party trademarks depends wholly upon their usage." *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167 (2d Cir.1976); *Sunenblick v. Harrell*, 895 F.Supp. 616, 627 (S.D.N.Y.1995) (Newman, J.) (citing *Scarves By Vera* for proposition that "third-party trademarks [are] significant not by virtue of their mere existence but upon proof of their usage and customer awareness of such marks"); *Nikon*, 1992 WL 114509, at *2 ("Absent evidence of usage, third-party registrations are of little value in determining the strength of the mark and the likelihood of confusion."); *Elizabeth Taylor Cosmetics*, 673 F.Supp. at 1244. Accordingly, the alleged infringer must demonstrate that the third-party marks were "actually used by third-parties, that they [are] well promoted or that they [are] recognized by consumers." *Scarves by Vera*, 544 F.2d at 1173. Moreover, third-party use has less effect where the third-party marks are used to promote "entirely unrelated products." *Id.* at 1174; *Elizabeth Taylor Cosmetics*, 673 F.Supp. at 1244–45 (noting that "third-party usage is less troublesome when ... the other marks stand for unrelated products" and discounting importance of third-party usage for products that did not compete in "quality, price or location"); *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 448 (S.D.N.Y. 1982) (noting, in secondary meaning context, that "the mere existence of third-party users of a name does not contradict a finding of secondary meaning where there is no evidence that the other names have either been promoted or are recognized by consumers" or are used in related fields); *Del Laboratories, Inc. v. Alleghany Pharmacal Corp.*, 516 F.Supp. 777, 781 (S.D.N.Y.1981) (noting minimal relevance of unrelated third-party listings); *Narwood Productions, Inc. v. Lexington Broadcast Services Company, Inc.*, 541 F.Supp. 1243, 1247 (S.D.N.Y.1982) (same). The mere presence of third-party registrations is not "evidence of what happens in the market place or that customers are familiar with their use." *Scarves by Vera*, 544 F.2d at 1173 (quoting *Lilly Pulitzer, Inc. v. Lilli Ann Corp.*, 54 C.C.P.A. 1295, 376 F.2d 324, 325 (Cust. & Pat.App.1967)); *E.S. Originals, Inc. v. Stride Rite Corp.*, 656 F.Supp. 484 (S.D.N.Y.1987) ("The presence of an everyday or common word in a trademark and the extensive use of variations of that word in third party registrations do not preclude a finding that the mark in question is a strong one."); *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 532 F.Supp. 1203, 1207 (S.D.N.Y.1982).

Defendant initially supported its claims of third-party use with listings from the Internet and the New York City White Pages, which indicate that over 125 businesses (sixty in New York City alone) incorporate the word "Lexington" in their names. (Puhala Aff.Exh. I). Some of these names even suggest that the businesses are in the financial services industry, for example, "Lexington

Financial Group," "Lexington Finance Company," "Lexington Capital," "Lexington Capital Corp.," "Lexington Investment Group," and "Lexington Equities." While this evidence suggests that there is, indeed, significant third-party use of the word "Lexington," it is not competent evidence because it does not demonstrate that these marks are "actually used by third-parties, that they were well promoted or that they were recognized by consumers." *See Scarves by Vera*, 544 F.2d at 1173. Because this evidence is devoid of any descriptive information apart from the companies' names, it does not show what these third-party businesses "do."

In light of the initial lack of evidence on this front, I asked the parties to submit supplemental evidence of third-party use of the "Lexington" mark, and each side has submitted a trademark search report prepared by the same private firm. (*See* Supplemental Declaration of Kenneth R. Puhala in Opposition to Motion for Preliminary Injunction, sworn to on February 13, 1998 ("Puhala Supp.Decl."); Supplemental Declaration of Stephen W. Feingold ("Feingold Supp.Decl.")).

Defendant's report lists 3,400 businesses and entities that incorporate the word "Lexington" in their names. (Puhala Supp.Decl. ¶ 5, Exh. B). Based on descriptions contained in these reports, these entities engage in a wide variety of business activities, ranging from apparel design to catering to home building to massage to weight control. (Puhala Supp.Decl.Exh. C). At first blush, such numerous listings appear to establish a 'crowded field,' demonstrating that many businesses consider "Lexington" to be an available and desirable mark.

But, as plaintiff's submission reveals, defendant's submission does not accurately portray the market and hence does not demonstrate that plaintiff's mark is weak. As an initial matter, defendant's report casts too wide a net. Regulations implementing the

Federal Trademark Act divide all goods and services into 42 classes. 37 C.F.R. § 6.1 (1997). Rather than restricting its search to "Class 36," which corresponds to "insurance and financial" services, defendant's search captured use of "Lexington" in all 42 classes. As a result, the vast majority of the 3,400 "Lexington" businesses in defendant's report engage in activities drastically different from plaintiff's. Moreover, of the "Class 36" businesses that apparently use the "Lexington" name, the overwhelming majority are involved in activities very distinct from sales of stocks and/or mutual funds; for example, many of these companies focus on consumer credit, insurance and real estate brokerage. Ultimately, as plaintiff points out, it appears that only seven entities employing the name "Lexington" are engaged in activities akin to those of the plaintiff, *i.e.*, sale of securities and/or mutual funds. (Feingold Supp.Decl. ¶ 12). Of those seven, plaintiff has obtained assurances from three that they will cease any further use of the "Lexington" mark in connection with services regulated by the SEC or the NASD. (Kantor Second Supp. Ver. ¶¶ 6–12; Feingold Supp.Ver. ¶ 11, Exh. E).[8]

To support its argument that extensive third-party use has weakened plaintiff's mark, defendant cites this Court's recent decision in *Trustees of Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733 (S.D.N.Y.1997). In determining that plaintiff's "Columbia" mark was weak in the healthcare realm, the court considered substantial evidence of third-party use in "a variety of businesses, including hospitals, healthcare services, and institutions." *Id.* at 745. These included eight hospitals, seven healthcare-related service companies, and eighteen colleges, a number of which were located near the plaintiff. *Id.* More generally, the court noted over one hundred federal trademark registrations incorporating the Columbia name in "medical, healthcare and

---

**8.** Plaintiff claims to have been unaware of the four remaining entities existed until it ran this comprehensive trademark search in connection with this action (Kantor Second Supp.Ver. ¶ 13), and has stated its intention to proceed against these alleged infringers upon resolution of the instant action. On this score plaintiff notes, and

I accept, Judge Weinfeld's recognition that a trademark owner need only fight one trademark battle at a time. *See Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 457 F.Supp. 1090, 1097 n. 28 (S.D.N.Y.1978), *aff'd without op.*, 607 F.2d 995 (2d Cir.1979).

other fields." *Id.* Although plaintiff attempted to downplay this third-party use, arguing that many of the entities used the mark because they were located in or near areas known as "Columbia," the court rejected the argument, noting that "whether or not there is a geographic reason for the selection of the Columbia name by these third parties, they are still openly using 'Columbia' as a name, thereby detracting from the plaintiff's claimed distinctiveness or exclusivity." *Id.* at 745.

Unlike here, however, the *Columbia* court was confronted with significant evidence of actual use. In this case, plaintiff has demonstrated that many of the entities contained in the defendant's listings are either inactive or involved in dissimilar fields. Further, unlike here, the plaintiff in the *Columbia* case had no existing rights or registrations in any healthcare related fields. In contrast, plaintiff in this case has a registered trademark in "financial advisory services and for services of or relating to mutual funds." The third-party use here does not meaningfully weaken plaintiff's mark.

Further, plaintiff has successfully policed against third-party use of its mark, sending cease and desist letters to unauthorized users of the "Lexington" mark for financial services, and successfully halting all such uses. (Kantor Second Supp.Ver. ¶¶ 4–12, Exh. B–G). Indeed, it appears that defendant here is the first entity to refuse to acknowledge and yield to plaintiff's rights in the "Lexington" mark in relation to services regulated by the NASD or SEC. (Kantor Ver. ¶ 22; Kantor Second Supp.Ver. ¶¶ 8, 13).

At bottom, because defendant's evidence does not demonstrate actual third-party use,

under *Scarves by Vera* it is incompetent to diminish the strength of plaintiff's mark. *See Bear U.S.A.*, 909 F.Supp. at 902 n. 14 (refusing to find that third-party use weakened a mark where defendant failed to show that "other alleged users of [the] mark are actively using them, using them in a manner that is confusingly similar, or are senior users with superior rights to the mark"); *see also Playtex Products, Inc. v. First Quality Hygienic, Inc.*, 965 F.Supp. 339, 342 (S.D.N.Y.1996) (failing to show actual dilution of the mark at the hands of third-party users); *Nikon*, 1992 WL 114509, at *2 (considering telephone listings and trademark registrations for the limited purpose of establishing that third-parties consider the word "smile" available for use in like and unlike fields).

Nonetheless, even if defendant's evidence did demonstrate actual use, and thus was probative as to strength, any weakening effect would be marginal. Because the entities using the mark in competitive services are limited in number (three) and isolated in location (in Massachusetts and Kentucky), and because plaintiff has undertaken generally diligent and successful policing efforts, any diminution in strength caused by third-party use here is minimal. At most this evidence transforms plaintiff's mark from "very strong" to "strong."

In sum, based on all of the above factors, I find that plaintiff's mark is strong and entitled to significant protection under the law; this factor runs in plaintiff's favor.[9]

### 2. Degree of Similarity

█ In assessing similarity of the marks, "courts look to the overall impression created

---

**9.** Defendant also argues that the recent performance of some of plaintiff's funds detracts from the strength of its mark. I disagree. Defendant has produced evidence that at least two of plaintiff's funds encountered some performance and personnel problems in the last quarter of 1997. (*See* Def.Mem. 8–9; Puhala Aff.Exhs. C & D). In particular, plaintiff's "Lexington Troika Dialog Russia Fund" was down in the last quarter of 1997, and lost one of its managers. (Puhala Aff.Exh. G). Further, plaintiff's "Lexington Strategic Investment Fund" was listed recently in the "CNNfn Lipper Mutual Fund Report" as having one of the ten worst performances over the last three years. (*Id.*, Exh. H).

While this evidence indicates that plaintiff's family of funds might not always be the subject of favorable publicity, it does not detract from the strength of plaintiff's mark. There is ample evidence that plaintiff is respected in the industry as a result of its many successful funds and, more importantly for present purposes, is the subject of frequent press coverage in a broad range of prominent publications. Accordingly, the recent less than optimal performance of one or more of plaintiff's funds does not detract from the strength of the mark.

by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Publishing v. Meredith Corporation,* 991 F.2d 1072, 1078 (2d Cir.1993). Generally, two factors come into play on this front: "1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers." *Sports Authority,* 89 F.3d at 962. I am not to look merely "at the typewritten and aural similarity of the marks, but [also at] how they are presented in the marketplace." *Id.*

As noted above, the plaintiff has protected rights in the mark "Lexington," which it uses in conjunction with its name, "Lexington Management Corporation," as well as with the names of its funds, for example, "Lexington Troika Dialog Russia Fund" and "Lexington Corporate Leaders Fund." The mark appears in print, television and radio advertisements, and in articles written in newspapers and other publications. "Lexington" always is the first word presented.

■ Defendant argues the marks are dissimilar, pointing out that it never uses the "Lexington" name alone, or with words such as "Fund" or "Trust," like plaintiff does with regard to its funds. (Stoffers Decl. ¶¶ 40–41, Exhs. H & L). Defendant also points to its letterhead, which displays the word "Lexington" in a non-distinctive typeface, in a style similar to that of the other words on the sheet. (Stoffers Decl. ¶ 39, Exh. P). This letterhead contains a logo comprised of the letters "LCP" displayed in an overlapping format. (*Id.*). As a result of these factors, defendant argues that its mark is not sufficiently similar to plaintiff's so as to create a likelihood of confusion.

I find that the marks in question are virtually identical. Both plaintiff and defendant use the mark "Lexington" in their names, and "Lexington" dominates in each case. The confusing similarity is bolstered by consideration of "the context in which they are found and ... the totality of factors that could cause confusion among prospective purchasers." *Id.* As noted above, defendant engages in no advertising (Stoffers Decl. ¶ 32) and relies on telemarketing ("cold call-

ing" in this industry) to engage customers. As such, the mark will often, if not always, be perceived aurally. In such a case, a potential investor likely will focus only on the lead word "Lexington," and hence be apt to confuse or associate defendant's cold call with plaintiff's business. As such, considering the "overall impression created by the logos," I find that they are exceedingly similar, and as such very likely to cause confusion. *See Gruner + Jahr,* 991 F.2d at 1078.

### 3. Proximity of Products

The third *Polaroid* factor, "proximity of products," concerns "whether and to what extent the two products compete with each other," a question which requires examination of "the nature of the products themselves and the structure of the market." *Cadbury,* 73 F.3d at 480; *Franklin Resources,* 988 F.Supp. at 329. The inquiry focuses on "the likelihood that customers may be confused as to the source of the products, rather than as to the products themselves." *Les Ballets Trockadero,* 945 F.Supp. at 571 (quoting *McGregor–Doniger,* 599 F.2d at 1134).

The Court of Appeals has suggested that the "proximity of products" factor should be considered together with the eighth *Polaroid* factor, "sophistication of the customers." *See Cadbury Beverages v. Cott,* 73 F.3d 474, 480 (2d Cir.1996) (noting that "sophistication of buyers" and "proximity of products" are analogous because the sophistication question "recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers"); *Franklin Resources,* 988 F.Supp. at 329 (following *Cadbury* and considering third and eighth *Polaroid* factors together); *Beneficial Corp. v. Beneficial Capital Corp.,* 529 F.Supp. 445, 449 (S.D.N.Y. 1982) (considering factors in tandem because "the closeness of two products is, at least in part, a function of the extent to which purchasers can and do examine and distinguish them").

■ To establish proximity that is likely to cause confusion, a plaintiff need not establish that its products or services are identical to those offered by the defendant. Rather, a

plaintiff must show that the parties' products or services "are sufficiently related that customers are likely to confuse the source of origin." *Scarves by Vera*, 544 F.2d at 1173; *Beneficial Corp.*, 529 F.Supp. at 449. Indeed, the products or services need not compete with one another. As the Court of Appeals has noted, "[c]onfusion, or the likelihood of confusion, not competition, is the real test of trademark infringement." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 257–58 (2d Cir.1987).

Determining the relative proximity of products or services requires examination of the customers to whom the products or services appeal, the markets in which they are sold, and the purposes for which they exist. *Franklin Resources*, 988 F.Supp. at 329 (citing *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 450 (S.D.N.Y.1982) (citing *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 158 (S.D.N.Y.1980) (Weinfeld, J.))). Here, the combination of actual and potential overlap practically ensures customer confusion.

Plaintiff is engaged primarily in the management and marketing of mutual funds, and defendant is engaged primarily in retail brokerage services; as such, they share potential customers and operate in the same market. As the *Franklin Resources* court noted, individuals who invest in mutual funds "have discretionary income, [are] prompted by concerns for their financial security, and [are] determined to do something about it." *Franklin Resources*, 988 F.Supp. at 330. This profile describes customers of both plaintiff and defendant.

In particular, both companies seek individuals with disposable income who desire investment opportunities. Presumably, individuals likely to invest in individual stocks would also be likely to invest in mutual funds; indeed, mutual funds themselves are composed of shares of various companies. Indeed, defendant itself even deals in mutual funds. Although defendant derives less than one percent of its revenue from this source, the fact that it sells the very products offered by plaintiff demonstrates clearly how close their products are to one another. While the companies here perform different specific services, they each compete for the same investor dollars and hence deal in the same markets. *See Dreyfus Fund Incorporated v. Royal Bank of Canada*, 525 F.Supp. 1108, 1118 (S.D.N.Y.1981).

Further, the manner in which leading brokerage houses have advertised Lexington funds (*see* Kantor Ver. ¶ 7) will cause customers to encounter the "Lexington" mark when seeking the services of full service brokers. Plaintiff's widespread presence in periodicals targeted at individual investors—both through its own advertising and the advertising of other brokerage houses—makes the likelihood great that such investors will be on notice of plaintiff's presence in the industry and hence be apt to mistakenly assume that a cold-call from one of defendant's "Lexington" brokers is somehow associated with plaintiff.

This proximity finding is supported by a number of decisions of the Patent and Trademark Office Trademark Trial and Appeal Board. In *American Stock Exch., Inc. v. American Express Co.*, 207 U.S.P.Q. 356, 364–65, 1980 WL 30139 (1980), the T.T.A.B. found that American Express' use of the "AMEX" mark in connection with investment banking, mutual fund, investment management, and international trust services created an unacceptable likelihood of confusion with the American Stock Exchange's use of the same mark in connection with its exchange service business, even though "exchange services," *i.e.*, the plaintiff's operation of a stock exchange did not include the actual marketing or sale of securities. In the Board's opinion, the relevant market was "investment securities," and mutual fund services were closely enough related to exchange services to justify a finding of likelihood of confusion based on false association. *American Stock Exch., Inc.*, 207 U.S.P.Q. at 364–65.[10]

---

10. Lest defendant argue this holding is too broad, I note that the Board rejected the Stock Exchange's claim that its mark occupied the entire field of financial services, and accordingly chose not to extend its likelihood of confusion finding to international banking services, military banking services, and insurance underwriting services. *Id.* at 365, 1980 WL 30139. This limitation is consistent with the more recent *Franklin Resources* and *Havens Advisors* deci-

Similarly, in *In re United California Brokers, Inc.*, 222 U.S.P.Q. 361, 1984 WL 63043 (1984), the Board held that the applicant, a brokerage concern dealing in real estate, insurance, commodities, stocks, bonds, mortgages, and loans, was sufficiently related to an opposing banking concern to establish that confusion would be likely if the two businesses used the same mark. The Board reached this conclusion despite acknowledging that banks were legally prohibited from engaging in many of the brokerage services engaged in by the applicant. Finding that confusion was nonetheless likely, the Board stated, "[w]e do not believe . . . that purchasers would be fully aware of such limitations or, if they were so aware, we think they would nevertheless be apt to assume come kind of connection by way of common ownership or holding company or affiliate relationships when confronted with the strikingly similar" marks. *Id.* at 362, 1984 WL 63043.

Here the relevant services are even more closely linked than those in *American Stock Exchange* and *California Brokers.* Concededly, plaintiff and defendant do not perform identical services or offer identical products. Nonetheless, because they both operate in the same discrete "investment securities" field, the likelihood of confusion—especially by association—is great.[11]

There is a real likelihood that potential customers will mistakenly assume that defendant's business is associated with or endorsed by plaintiff. To borrow language from the Board, "it would be quite natural for potential investors who associate the mark [Lexington] with [plaintiff] and its [mutual fund services] to assume, if they encountered [retail brokerage] services identified by the mark [Lexington], that such services

were endorsed or approved by or in some other way associated with [plaintiff]." *American Stock Exchange*, 207 U.S.P.Q. at 364. Indeed, potential investors would "be apt to assume some kind of connection [between plaintiff and defendant] by way of common ownership or holding company or affiliate relationships when confronted with the strikingly similar [Lexington] marks." *California Brokers*, 222 U.S.P.Q. at 362. In this regard, the proximity of the parties' products and services virtually guarantees confusion because investors are so apt to assume the parties are related by "endorsement," "approval," or "association."

The sophistication of the potential customer class does not change this result. In *American Exchange* and *California Brokers*, legal obstacles prevented the parties from engaging in identical conduct. The Board nonetheless found that the customer class—investors—was likely to confuse the source of origin of the parties' products or services. *American Stock Exch., Inc. v. American Express Co.*, 207 U.S.P.Q. at 365 ("[W]e cannot agree with applicant's contention that potential investors are so sophisticated and wise that they would necessarily know that opposer could not become involved in such activities without running afoul of SEC regulations."); *California Brokers, Inc.*, 222 U.S.P.Q. 361, 1984 WL 63043 (1984) ("[W]e do not believe that purchasers would be fully aware" that "banks may be legally prohibited from engaging in many of the services conducted by applicant."). Here, where no such legal obstacles exist, the likelihood of confusion, especially associative confusion, is even greater regardless of the sophistication of the potential investors.

#### 4. Bridging the Gap

"Bridging the gap" is closely related to the "proximity of the products" factor.

---

sions, which found that mutual fund services were not so closely related to, respectively, debt collection and risk arbitrage, so as to justify finding likelihood of confusion. *See Franklin Resources*, 988 F.Supp. at 327; *Haven Capital Management, Inc. v. Havens Advisors*, 965 F.Supp. 528 (S.D.N.Y.1997). Where, however, the services or products in question both exist in the same corridor, *e.g.*, the investment securities market, the likelihood of associative confusion is very high. That is the case here.

11. This conclusion is bolstered by evidence indicating that mutual fund companies recently have begun to offer retail broker/dealer services, and retail broker/dealers have begun to offer mutual fund services. (Kantor Ver. ¶ 18). Brokers' advertisements tout the mutual funds they sell, including those from plaintiff's family of funds. (Kantor Reply Ver. ¶ 18–20). In such circumstances, the risk of associative confusion is enormous.

*Lois Sportswear*, 799 F.2d at 874. This factor contemplates "the senior user's interest in preserving avenues of expansion and entering into related fields." *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 504 (2d Cir.1996); *Les Ballets Trockadero*, 945 F.Supp. at 571. While plaintiff has not presented evinced any intention to enter the retail brokerage field, this factor "turns not so much on objective evidence of actual expansion or potential therefor as it does on whether it is reasonable for the ordinary purchaser to assume such expansion." *Dreyfus*, 525 F.Supp. at 1119–20.

As noted in plaintiff's affidavits (Kantor Reply Ver. ¶ 17), full-service brokers such as Merrill Lynch and Prudential Securities offer mutual funds, including plaintiff's Lexington funds. Further, Lexington's prominent presence in the investment community, combined with the increasingly consolidated nature of the investment market, makes it likely that plaintiff could be perceived as providing a broad range of investment services, including those currently offered by defendant. As such, potential customer perception that plaintiff might offer defendant's services tends toward there being a likelihood of confusion with regard to plaintiff's "bridging of the gap." This factor runs in plaintiff's favor.

### 5. Actual Confusion

■ This factor inquires whether there is evidence of " 'consumer confusion that enables a seller to pass off his goods as the goods of another.' " *Sports Authority*, 89 F.3d at 963 (quoting *W.W.W. Pharmaceutical*, 984 F.2d at 574). Plaintiff has not provided any evidence of actual confusion in connection with this motion for a preliminary injunction. However, "actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear*, 799 F.2d at 875; *Les Ballets Trockadero*, 945 F.Supp. at 571. Accordingly, this factor neither supports nor detracts from the likelihood of confusion.

### 6. Defendant's Good Faith

With regard to the sixth factor, I will presume defendant acted in good faith.[12] But because "intent is largely irrelevant" in determining whether consumers are likely to be confused as to source, *Lois Sportswear*, 799 F.2d at 875, defendant's benign intent alone cannot vitiate the likelihood of confusion.

### 7. Quality of Defendant's Product

■ This factor "generally considers whether the senior user's reputation could be tarnished by inferior merchandise [or services] of the junior user." *Cadbury*, 73 F.3d at 483. Plaintiff has made great efforts to question defendant's registration status and regulatory history.[13] The evidence now establishes that defendant is a validly registered broker/dealer with the NASD, the SEC, 47 states and the District of Columbia. (Stoffers Decl. ¶ 2). Nonetheless, plaintiff has presented evidence of regulatory and consumer action taken against defendant.

In particular, plaintiff alleges that defendant has been the subject of numerous

---

**12.** I make this concession even though plaintiff contends that its strong and widespread presence in the investment market and press makes it unlikely that defendant could not have known of plaintiff's business and trademark rights.

**13.** Without going into great detail, I note that plaintiff has made numerous erroneous allegations that defendant is a rogue corporation operating illegally and without registration from the NASD, SEC, or state regulatory bodies. (*See* Pl.Mem. at 2, 7–9, 22, 23–25 (alleging "highly irregular, and apparently illegal, business practices"); Affidavit of Stephanie M. Foster, Sworn to on January 27, 1998, ¶¶ 13–18, 20, 23, 28; Kantor Ver. ¶¶ 28–33, 37, 39, 42).

Plaintiff now concedes at least that its allegations were based on incomplete information, particularly on the claim that defendant was not registered. (*See* Pl. Reply. Mem. at 9; Reply Affidavit of Stephanie M. Foster, Sworn to on February 5, 1998 ("Foster Reply Aff.") ¶ 3). Plaintiff unsuccessfully attempts to excuse its error, claiming that it prepared its motion on an expedited basis because of the "immediate need to seek injunctive relief," and that any statements made were based on diligent research and believed to be true at the time they were made. (Foster Reply Aff. ¶ 2).

While these facts might provide the context in which the papers were prepared, they do not relieve plaintiff or its counsel of responsibility for having made these erroneous allegations.

NASD arbitrations brought by customers, a number of which resulted in damage awards to the customers. (Foster Reply. Ver. ¶ 11). Additionally, defendant or its predecessor has been twice censured and fined by the NASD, recently in 1996 for a failure to maintain minimum net capital. (*Id.*). Further, five different states have commenced disciplinary proceedings against defendant or its predecessor. (*Id.*).

While "pass[ing] no judgment on the underlying allegations" of these proceedings, or on "whether these complaints are significant or well-founded," (Pl. Reply Mem. at 11), plaintiff nonetheless contends that the mere presence of this information in the public domain will tend to tarnish plaintiff's mark.[14] This is because any reasonable investor who attempts to gather information on a financial service provider named "Lexington" will come across this unsavory information, much in the manner that plaintiff came across the information. Such an investor will not be able to distinguish defendant's "Lexington" mark from plaintiff's "Lexington" mark and will mistakenly conclude that the firms are at least associated, if not identical.

Even accepting these allegations concerning NASD proceedings and regulatory body action, which defendant does not contest, I find that plaintiff has failed to submit evidence sufficient to establish that association with defendant's business would work the kind of harm to plaintiff's reputation that would point this factor in plaintiff's favor. Further, the mere fact that defendant might engage in "cold-calling" does not place this factor in plaintiff's favor. While defendant's methods of drumming up business might be more aggressive and lower market than plaintiff's, I have not been presented with evidence suggesting that they are so "extreme or unwholesome" that mere association would disparage plaintiff's reputation. *See Franklin Resources*, 988 F.Supp. at 337.

### 8. Sophistication of Customers

This factor was discussed above in light of the proximity of services.

### 9. Balancing of the Factors

▮ "The Polaroid factors are not examined by any precise measure but ... are weighed only to ascertain whether there is a likelihood of confusion on the part of an appreciable segment of the purchasing public as to the source of the product." *Gruner + Jahr*, 991 F.2d at 1080 (citing *Lois Sportswear*, 799 F.2d at 872). Accordingly, in considering these factors I must not lose sight of the fundamental question: whether defendant's use of the "Lexington" mark would cause an appreciable number of ordinarily prudent purchasers to be confused. Likelihood of confusion is the essence. Keeping this ultimate question in focus, I note that "[e]ach case ... presents its own peculiar circumstances." *Lois Sportswear*, 799 F.2d at 871.

As noted above, I find that five factors tend toward a likelihood of confusion: plaintiff's mark is strong; plaintiff's mark is virtually identical to defendant's, especially when one considers the manner in which the marks are likely to be presented in the marketplace; the parties' services and the markets in which they are offered lie in close proximity; ordinary purchasers are likely to assume that plaintiff has or intends to "bridge the gap" into retail brokerage services; and the parties' customers are not so sophisticated as to avoid confusion as to the source of the parties' services.

Although plaintiff has not demonstrated actual confusion, has not established defendant's bad faith, and has not shown that defendant's services are of inferior quality, I find on balance that the factors tending toward confusion clearly overwhelm those that do not. In this case I am influenced by the Court of Appeals' recognition that determining likelihood of confusion "often depends on the similarity of the marks and the proximity of the products." *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 966 (2d Cir.1981). In this case, after considering all the factors together, as well as similarity and proximity in particular, I am persuaded that there exists a substantial likelihood of confusion. As such,

---

**14.** I note parenthetically that the mere existence of customer complaints and even arbitration awards in the retail brokerage business is not evidence of much of anything *except* being in the retail brokerage business.

plaintiff has made a clear showing that defendant's continued use of the "Lexington" mark will cause confusion as to source or association. Accordingly, plaintiff has clearly demonstrated entitlement to relief on the merits of its Section 32 and Section 43(a) claims within the meaning of *Tom Doherty Associates,* 60 F.3d at 34.

## IV. SECTION 43(c) OF THE LANHAM ACT

Plaintiff's also moves under Section 43(c) of the Lanham Act. Section 43(c) entitles the owner of a famous and distinctive mark to an "injunction against another person's commercial use of a mark or trade name if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c). Accordingly, to prevail under this section plaintiff must demonstrate (1) ownership of a distinctive or famous mark and (2) dilution. *See Clinique Laboratories, Inc. v. Dep Corp.,* 945 F.Supp. 547, 561 (S.D.N.Y.1996) (Scheindlin, J.). This section "protect[s] famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it...." *Id.* (citing H.R.Rep. No. 374, 104th Cong., 1st Sess. 3, *reprinted in* 1995 U.S.C.C.A.N. 1029, 1030).

### A. Famous or Distinctive Mark

Section 43(c) sets out factors relevant to whether a mark is distinctive or famous.[15] Many of these factors correspond to factors I considered in determining the strength of plaintiff's mark in the realm of mutual fund and investment advisory services. For the same reasons that I found plaintiff's mark strong under infringement and false designation analysis, I find plaintiff's mark distinctive under Section 43(c). *See Clinique,* 945 F.Supp. at 561.

### B. Dilution

■ Dilution may be shown by either blurring or tarnishment. *Clinique,* 945 F.Supp. at 561; *see Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 506 (2d Cir.1996); *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 42 (2d Cir.1994). Tarnishment will be found where a mark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context." *Hormel Foods,* 73 F.3d at 507; *Clinique,* 945 F.Supp. at 561. Despite plaintiff's strained attempts to show tarnishment, noted *supra,* part III.B.7, this record does not contain evidence to establish that defendant's use of the "Lexington" mark will tarnish plaintiff's mark.

■ Blurring, on the other hand, is likely. Blurring occurs when "[c]ustomers or prospective customers ... see the plaintiff's mark used on a plethora of different goods and services." *Hormel Foods,* 73 F.3d at 507 (citing 3 McCarthy § 24:13[1][a][i] at 24–106). This practice "raises the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Id.* Dilution does not depend on the potential for confusion; "the unauthorized pullulation itself causes the harm." *Hormel Foods,* 73 F.3d at 506.

Five factors are relevant to blurring analysis: 1) similarity of the marks; 2) similarity of the products; 3) sophistication of consumers; 4) renown of the senior mark; and 5) renown of the junior mark. *Clinique,* 945 F.Supp. at 561. Above I noted the similarity of both the marks and services in question and found plaintiff's mark to be strong. I also determined that the relevant consumers were not so sophisticated as to avoid potential confusion.

---

**15.** These factors are:
 (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is

used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks, owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the act of February 20, 1905, or on the principal register.
15 U.S.C. § 1125(c)(1).

The parties have submitted little evidence on the remaining factor, the renown of the junior user's mark. However, the mark is unlikely to be famous because defendant only recently began to use the mark and also does not appear to advertise. As such, this factor would tend against a finding of dilution. However, I am persuaded by Judge Scheindlin's observation that this factor has marginal relevance in cases, like this, which involve newly launched products or services. *See Clinique*, 945 F.Supp. at 562. On balance, I find that plaintiff clearly has demonstrated a likelihood of dilution and, hence, a clear entitlement to relief on the merits.

## CONCLUSION

Plaintiff Lexington Management Corporation's motion for a preliminary injunction based on Section 32, Section 43(a) and Section 43(c) of the Lanham Act is granted. Accordingly, defendant Lexington Capital Partners & Co., Inc., its officers, agents, servants, employees, and attorneys and all persons in active concert and participation with them who receive actual notice of this order, by personal service or otherwise, are enjoined and restrained, pending the hearing and determination of this action, from using the mark "LEXINGTON," or any similar mark likely to cause confusion with or dilution of plaintiff's "Lexington" mark, in connection with the sale, offering for sale, distribution or advertising of mutual funds, or in connection with financial advice, broker-dealer or investment advisor services, anywhere in the United States.

This injunction shall take effect at 5:00 p.m. on Friday, March 6, 1998, provided that plaintiff by that time shall have posted a bond or given other security satisfactory to the court, pursuant to Fed.R.Civ.P. 65(c) and 65.1, in the amount of $50,000.00, for the payment of such costs and damages as may be incurred or suffered by defendant if it is found to have been wrongfully enjoined or restrained.

SO ORDERED.